**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

| | |
|---|---|
| Michelle Simha, as Trustee for the Next-of-Kin of Noah Leopold, <br><br> Plaintiff, <br><br> vs. <br><br> Mayo Clinic, <br><br> Defendant. | Civil File No. 24-CV-01097-DTS |

**Plaintiff's Memorandum of Law in Response**
**to Mayo's Motion for Discovery Sanctions**

### Introduction

At a bare minimum, Mayo deserves points for audacity.

While Noah Leopold was a patient under its care, Mayo explicitly promised him he had "the luxury of time" to wait for a "good heart." It assured him it would not accept a "marginal heart" for him, and would instead wait for the "perfect heart." And Mayo assured him it would not accept a heart from a donor who had had a drug overdose without talking to him about it first.

Plaintiff alleged these things in her Complaint. Mayo denied them in its Answer.

1

Plaintiff knew Mayo had made these assurances. So she followed up with Requests for Admissions, giving Mayo another chance to admit the truth. Mayo again denied that the statements had been made.

Plaintiff then deposed various Mayo doctors, asking them if they denied they had made these statements to Noah and his family. They testified, under oath, that they did not make and would not have made the statements.

Plaintiff's counsel then showed one of those witnesses, Dr. Bradley Ternus, a video recording that contradicted his sworn testimony. It also contradicted the denials Mayo had made in its Answer, and the denials Mayo had made in its sworn discovery responses.

In other words, Plaintiff conducted a textbook impeachment by contradiction. *See Wegener v. Johnson*, 527 F.3d 687, 691 (8th Cir. 2008) ("To attack the credibility of witnesses by the presentation of evidence showing that facts asserted or relied upon in their testimony are false is to impeach by contradiction.").

The logical – not to mention ethical – response would have been for Mayo and its lawyers to make some semblance of a mea culpa, followed by a swift move to correct the multiple now-obviously false claims that had been made. Instead, in a maneuver that shows some serious chutzpah, Mayo has attacked Plaintiff for catching it red-handed in its falsehoods.

Worse yet, nearly two months have passed since Mayo and its agents were presented with irrefutable evidence that their previous sworn claims were wrong. Plaintiff's counsel has even reminded Mayo of its obligation to correct the record. Not only has Mayo failed to do so, it has doubled down on its falsehoods and refused to acknowledge it has either a legal or an ethical duty to come clean.

Now, as part of its attempt to deflect blame and bury the evidence that it got caught with its hand in the cookie jar, Mayo tells this Court that "no rule or case authorizes withholding or delaying production of responsive documents for use as purported 'impeachment' evidence." Mayo Br. at 17. As will be outlined below, even the most rudimentary legal research would have told Mayo that this claim too is patently false. Courts across the country – including in the Eighth Circuit – agree that impeachment-only evidence is protected from discovery. And Courts across the country – including in the Eighth Circuit – agree that if impeachment evidence is to be produced, it should only be produced on the timetable that occurred here: after a witness has been deposed, thereby "preserving the impeachment value" of the evidence.

There was no discovery violation here, and Mayo's motion for sanctions should be denied.

### History of Discovery in this Case

Mayo spends much of its brief arguing – both implicitly and explicitly – that Mr. Leopold's family and their lawyer are shady characters who "surreptitiously" recorded an unsuspecting Mayo doctor, then "flagrantly violated" the discovery rules "to gain tactical advantage in this litigation." Mayo Br., Doc. 39, at 1. As part of painting Plaintiff's counsel with this brush, Mayo sprinkles its brief with cherry-picked anecdotes of things that have happened in discovery so far.

What follows is a complete summary of what has transpired in this case to date. The summary is lengthy. But in Plaintiff's view, if the Court is going to evaluate whether Plaintiff has abused the discovery process so flagrantly that sanctions are warranted, it is important to have the full picture. Because the full picture is far different from the one Mayo paints in its brief.

**January to April 2024:**   **Plaintiff puts Mayo on notice of a claim, Mayo investigates and denies, a lawsuit commences**

Plaintiff put Mayo on notice of this claim on January 12, 2024. Ex. CC at 1. Mayo's in-house counsel indicated it would conduct an internal review. *Id.* at 2. On February 21, Mayo informed Plaintiff it had investigated the case, did not "see any basis for a claim of negligence," was not interested in trying to resolve

the case, and that in the event Plaintiff decided to move forward Mayo had appointed an attorney at Dorsey to accept service. *Id*. at 3.

On March 15, Plaintiff sent Mayo and its counsel a letter requesting information she considered "highly relevant to this impending litigation." *Id*. at 4-6. The parties subsequently had some logistical discussions, and the Complaint was filed on March 28. It contained specific allegations about specific assurances Mayo and its agents had made to Noah. *See* Doc. 1 at ¶¶ 9-12, 30.

**May 2024:    Discovery commences, Mayo is on notice Plaintiff intends to depose Dr. Ternus, Mayo denies it made assurances to Noah**

On May 2, the parties had their Rule 26(f) conference. Plaintiff's counsel sent a detailed follow-up email on a variety of discovery issues, including the documents that had been requested in March (Mayo had refused to produce them without a formal discovery request) and a list of witness to be deposed. Ex. CC at 11-12.

Mayo presumably had spoken with most, if not all of, the witnesses on that list as part of the investigation it conducted prior to "denying" Plaintiff's claim. But as of May 2, Mayo unquestionably knew that Dr. Ternus was a key witness. Mayo promised to get to work scheduling depositions.

On May 17, Plaintiff served Requests for Production. They specifically requested, among other things, all the information Plaintiff had already asked for back in March.

On May 20, Plaintiff's counsel followed up on the Rule 26(f) report (which had not yet been finalized) and deposition dates. *Id*. at 14. Several days later the parties filed the report (*see* Doc. 11), and a deposition schedule (later modified) was set.

On May 28, Mayo filed its Answer (Doc. 10). The Answer denied the allegations regarding statements Mayo made to Noah and his family. Doc. 10 at ¶¶ 9-12, 30.

Before denying the allegations in the Complaint, Mayo and its counsel had an obligation to conduct a reasonable inquiry; signing the Answer certified that "an inquiry reasonable under the circumstances" had been performed, and that "the denials of factual contentions are warranted on the evidence." Fed. R. Civ. P. 11(b). Presumably as part of that reasonable inquiry someone spoke with the doctors Plaintiff was planning to depose and asked them if they had made the very specific statements Plaintiff had alleged in the Complaint – after all, that list had been provided to Mayo more than three weeks before the Answer was signed and filed.

**June 2024:   Discovery continues, Mayo provides virtually meaningless responses to Plaintiff's RFPs**

Mayo's responses to Plaintiff's RFPs were due on June 17. In the interim, on June 3, Plaintiff served Requests for Admission. Brantingham Decl. (Doc. 42), Ex. E. Those Requests again asked Mayo to admit it had made certain specific statements to Noah.

On June 17, Mayo served its "Objections and Responses to Plaintiff's First Set of Requests for Production." Ex. DD. The document started with a boilerplate list of "general objections." Each response to each specific request also started with a version of the same boilerplate general objections.[1]

More problematically, Mayo produced virtually no documents of use. Plaintiff had served twenty-four separate requests. Mayo produced documents in response to only two of them: the request for Mr. Leopold's medical records (which Plaintiff already had, she was just making sure there weren't more she wasn't aware of) and bills, and several CDs of medical imaging. Mayo simply referred Plaintiff to the medical records in response to Requests 8 and 11, and claimed it had no documents responsive to Requests 4, 13, 16, 20, and 24 (a claim which later turned out to be untrue). For Requests 2 and 21, Mayo said

---

[1]     In the Eighth Circuit, it is well-established that the overuse of boilerplate and general objections is both inappropriate and "ineffectual." *See, e.g. Lynch v. Experian Information Solutions, Inc.*, 569 F.Supp.3d 959, 963 (D. Minn. 2021).

production would be "forthcoming" but gave no idea of timing. For Request 22, Mayo simply refused to provide documents.

The other Requests - 3, 6, 9, 10, 12, 14, 15, 17, 18, 19, and 23 – were where Plaintiff sought the "highly relevant" documents her counsel had requested three months prior. Mayo did not produce a single document in response to those requests. Instead, Mayo insisted that those documents – the ones Plaintiff actually wanted and didn't have – would only be produced "following entry of a mutually-agreeable protective order." Ex. DD at Requests Nos. 3, 6, 9, 10, 12, 14, 15, 17, 18, 19, 23.

Mayo offered no explanation for why it had not raised the protective order issue earlier. It presumably had gathered many of these documents long before, either in January when it conducted its internal investigation or in March when Plaintiff specifically asked for them. Mayo's decision to not even mention a protective order until the eleventh hour, then withhold the "highly relevant" documents Plaintiff had been seeking for months, smacked of gamesmanship. And Plaintiff was now in a bit of a quandary, because depositions were less than two months away and not a single page of the important documents had been produced.

So Plaintiff hurried to get an agreement on an acceptable protective order, following up literally that same day. Ex. CC at 18. Mayo dragged its feet on

8

responding (*see id*. at 19-22), and another precious week lapsed before the stipulation for the protective order was finalized and filed. *See* Doc. 16.

**June 24 to July 1:   As depositions loom, Mayo continues to delay producing the most relevant documents**

On the day the stipulation was filed, Plaintiff's counsel asked Mayo when the documents would be produced. Ex. CC at 23. Mayo responded that it wouldn't produce the documents until "after the Court enters the protective order." *Id*. at 24. More concerningly, it indicated that the documents <u>were not even ready to be produced</u>: Mayo had "additional documents in-house" that it was "currently preparing for production," and anticipated producing them "next week." *Id*. Mayo did not explain which documents it was planning to produce, nor did it explain why those documents had not already been prepared for production given that we were now a week past the production deadline.

Plaintiff's counsel then asked when the pathology slides (tissue samples of the hearts at issue in the case, some of the "highly relevant" evidence Plaintiff had been asking for since March) would be produced, because those slides were not subject to the protective order. *Id*. at 25. Mayo's response was that it was "working with pathology to collect and produce the slides," had no "firm timeline," but expected "it to be in the near term." *Id*. at 26. Again, no

9

explanation for why these slides – which Plaintiff first requested three months before – had not been produced in a timely manner.

Plaintiff followed up, expressing both frustration and puzzlement at Mayo's actions and vague responses. *Id.* at 27. Mayo (consistent with the way it has handled this litigation, not to mention the issue currently before the Court) was unapologetic for its delays, and basically told Plaintiff's counsel to stop complaining. *Id.* at 28. Plaintiff's counsel asked if Mayo could "at least commit to getting me the documents prior to our July 2 conference?" *Id.* at 29. Mayo ignored that email.

**July 1:**      **After promising the documents would be produced "next week,"
Mayo continues to delay**

Hearing crickets, Plaintiff followed up with Mayo on July 1. *Id.* at 30. Mayo's counsel indicated that a "supplemental production" would be coming "shortly," but that the production still would not include the pathology slides. *Id.* at 31. The depositions were now less than six weeks away, and Plaintiff had not received a single page of useful production.

The production came later that day. It was a document dump. There was no explanation for what any of the documents were, and no pleading tying any of the documents to any of the specific document requests. Plaintiff immediately followed up asking Mayo to provide some semblance of an explanation for

which document was which. *Id.* at 33. Plaintiff then realized, after poring over the documents, that the production was <u>still</u> incomplete. One of the most important pieces of evidence, the data from the blood gas analyzer that was used during the transport of the donor heart, was conspicuously missing. So Plaintiff followed up asking where it was. *Id.* at 34.

Mayo's counsel responded and said "I am preparing this [the blood gas analyzer] data for production. I expect it to be on the same timetable as the pathology slides." *Id.* at 35. Why had Mayo not been forthright, and told Plaintiff that critical information was (still) not yet ready for production? Mayo offered no explanation, and again offered no hint of contrition.

Plaintiff then pointed out that Mayo still had not produced a single document responding to four of the RFPs. *Id.* at 36-37. Mayo did not reply.

**July 3:    Mayo responds to Plaintiff's Requests for Admissions, and again denies having made the specific statements to Noah**

On July 3 Mayo responded to Plaintiff's Requests for Admissions. Mayo's counsel signed the responses, again certifying that a reasonable inquiry had been conducted and that the denials were warranted by the evidence. Fed. R. Civ. P.

11(b); Fed. R. Civ. P. 36(a)(4). As it had in its Answer, Mayo denied that the statements had been made.[2]

**July 5:        Mayo produces a third round of documents… which is still incomplete**

On July 5, Mayo finally produced the pathology slides and what appeared to be the blood gas analyzer data. But Plaintiff couldn't tell for certain what it was, because Mayo still had provided no explanation for what all the documents were and which RFPs they were responsive to. Plaintiff was left to guess. And Mayo still had not produced any emails, texts, or other communications between its providers about Noah – which is often (as it turned out to be here, more on

---

[2]        In what seems to be a lukewarm attempt to justify a denial it now knows to be categorically false, Mayo complains that because Plaintiff "did not identify the Mayo personnel who allegedly made the statements," it was left "without any reasonable way to investigate the source of the alleged statements." Mayo Br. at 6. But by July 3, Mayo had known for more than three months that Plaintiff was alleging its doctors made specific statements to Noah, and had known for more than two months the exact identity of the doctors Plaintiff wanted to depose. The first thing any halfway competent lawyer would have done in responding to the RFAs is sit each of those doctors down and say "Plaintiff's counsel is claiming someone at Mayo told Noah he had the 'luxury of time' to wait for the 'perfect heart.' Are you the one who told him that?"

It is difficult to believe that didn't happen – particularly given that Mayo's counsel certified that a "reasonable inquiry" had been made prior to denying the RFAs. If no one asked the Mayo doctors whether they made the statements, what could a "reasonable inquiry" have possibly consisted of?

that later) some of the most important evidence in a case. So Plaintiff had to follow up yet again, asking where the documents were. *Id*. at 39.

**July 9-12:   With the depositions just a month away, Plaintiff's counsel continues to try to get Mayo to produce critically relevant documents**

Mayo didn't respond until July 9. Again with no explanation or apology for the continuous delays, Mayo tersely responded that it planned to "complete our production this week" and had no intention of providing any additional information explaining which documents were responsive to which requests. *Id*. at 40.

Plaintiff's counsel followed up with a lengthy email explaining the myriad deficiencies in Mayo's responses and trying to find a solution that would result in the production of the documents so the depositions could go forward as scheduled. *Id*. at 41-45. As the Court can imagine, Plaintiff's counsel would have preferred to spend his time preparing for the looming three days of complex depositions rather than constantly having to hound Mayo to get documents that should have been produced weeks before.

On July 12, Mayo did two things. The first was to produce another pile of documents. The second was to send a lengthy letter continuing to justify its discovery delays. *Id*. at 47-54. Consistent with its modus operandi to that point,

Mayo offered no contrition or explanation for why it was continuing to produce critically relevant documents nearly a month past its production deadline and only a month before depositions. It did, however, claim that all "responsive and discoverable information" had now been produced. *Id.* at 47. It also took Plaintiff's counsel to task for making "baseless" and "time-consuming" requests for follow-up. *Id.* at 53. Given Mayo's intransigence to this point it should not have been surprising that Plaintiff's counsel felt the need to follow up. And as will become evident as this saga continues, Plaintiff's counsel was right to suspect there was still more to be found.

**July 13:**  **Plaintiff uncovers four new, key witnesses Mayo had not disclosed**

In what had become a tiresome pattern, Plaintiff dug into Mayo's most recent production to try to decipher what had been produced (Mayo still refused to provide any semblance of an explanation for any of the documents) and what was still missing. It didn't take long for Plaintiff to discover, buried in the production, a series of text messages between individuals Mayo had never identified and who had not appeared in a single page of Noah's medical records. The content of these text messages, as outlined in Plaintiff's punitive damages brief, was shocking. Almost as shocking was the fact that Mayo had obviously known about these four people for quite some time (how else would Mayo have

14

been able to get text messages from the individuals' phones), and that two of those people had been the OCS technicians tasked with monitoring the donor heart during transport.

Plaintiff immediately followed up with Mayo's counsel. *Id*. at 55. It hardly seemed worth seeking an explanation for why these people hadn't been disclosed, so Plaintiff simply sought to get their depositions scheduled as soon as possible. Plaintiff also asked for an explanation of what one of the newly-produced documents was (Plaintiff had given up trying to get Mayo to reveal which documents were responsive to which request), because the document was utterly indecipherable. *Id*. at 56.

Mayo did not respond to the request about the indecipherable document, and resisted scheduling the depositions of the four new individuals. In fact, almost three months later only one of them has been deposed.

**July 19-30:   Four weeks from the depositions, Plaintiff continues to have to follow up on discovery**

Having waited nearly a week with no response, Plaintiff followed up yet again. *Id*. at 57.[3] Mayo's gamesmanship continued, as it continued to stonewall

---

[3]     This email also references Plaintiff's concerns about Mayo's overuse of the "confidentiality" designation. In what appears to be a strategy to keep as much of this case under wraps as possible (a strategy consistent with Dr. Villavicenio's testimony), Mayo has designated virtually every document it has produced – including documents that are easily accessible online – as "confidential." Mayo

on straightforward (yet important) issues like identifying where in the medical record it claimed the informed consent discussions were documented. *Id*. at 58-59. It also provided a partial explanation for what was on the indecipherable document. *Id*. at 58.

Plaintiff's counsel continued to try to sift through the mountains of complex new data Mayo had produced (as is probably clear from the timing of emails, Plaintiff's counsel was at this point working nights and weekends), and on July 22 uncovered still more issues: Mayo had produced hundreds of video files with bizarre file types and no explanation for what they were; the video files had been accompanied by a cryptic letter from a Dorsey paralegal saying simply "enclosed is a flash drive containing information related to Mr. Leopold." *Id*. at 62-63. Yet again, Plaintiff's counsel had to spend time sorting through discovery issues rather than preparing for depositions.

Mayo did not respond, so Plaintiff's counsel – feeling essentially out of options – reached out to the Court to schedule an informal conference. *Id*. at 64. This seemed to trigger a response from Mayo (albeit a caustic one, *see id*. at 65), and the parties were able to reach a compromise and avoid involving the Court. *Id*. at 65-73.

---

seems to have accelerated that strategy, designating every page of every deposition taken so far in this case "confidential." This is an issue the Court will need to wrestle with soon, when the parties file their joint motion on continued sealing pursuant to L.R. 5.6(d)(3).

16

**July 30:      Less than three weeks after claiming all responsive documents had been produced, Mayo produces still more documents**

On July 30 – six weeks past the production deadline, three weeks after claiming everything had been produced, and less than two weeks before the depositions – Mayo produced 67 more pages of documents. This included patient education material (critical to an informed consent claim), and still more communications between providers. Yet again, Mayo provided no explanation for why these documents had not been uncovered and produced before.

**August 5:   Plaintiff follows up on still more missing documents**

One type of important document in this case is a "call log"; it is essentially a list of the organs that were offered to Mayo transplant patients on each day, along with a code for the decision about that organ. Plaintiff discovered that Mayo had only produced the call log for a single day, and that it had produced no information whatsoever about all the hearts that had been made available for Noah prior to the one that was ultimately accepted on August 29. And so Plaintiff had to follow up, yet again, to get documents that should have been produced long before. *Id.* at 74.

**August 7:**    **Mayo provides a threadbare response to Plaintiff's single interrogatory, necessitating still another follow-up**

In an effort to focus and streamline discovery, Plaintiff served only a single interrogatory on Mayo prior to depositions. That interrogatory was designed to understand what conversations the Mayo doctors could remember having amongst themselves about Noah, so Plaintiff's counsel could properly prepare to follow up in depositions. And to head off the inevitable stonewalling, Plaintiff tried to be as precise and clear as possible in her wording. Ex. EE at 4.

Despite Plaintiff's best efforts, Mayo's response was predictable. First, it interposed ten different "general objections" and a host of other specific objections to Plaintiff's single interrogatory. Then it provided what can only be characterized as complete non-answers. So Plaintiff's counsel – now just five days from deposing these individuals – had to yet again battle about discovery. *Id.* at 76-78.  Mayo's response, again predictably, was that "Mayo stands by its answer." *Id.* at 79-80. Unsurprisingly, the witnesses had much more to say in their depositions than Mayo had provided in the interrogatory answer.

**August 8-9:**    **Mayo raises concerns about Plaintiff's discovery responses, Plaintiff offers explanations and invites further discussion, Mayo declines and decides to move forward with the depositions**

At the same time Plaintiff's counsel was (a) engaging in a never-ending battle to get Mayo to produce documents, (b) trying to decipher or get explanations for the documents that had been produced, and (c) preparing for depositions (including the deposition of a surprise critical witness whose very identity had been withheld for months), Plaintiff was also working to respond to Mayo's discovery requests. Those responses were timely served on August 1.

Unlike Mayo, Plaintiff did not make inappropriate general and boilerplate objections. And unlike Mayo, Plaintiff was very clear and specific about which documents were responsive to which requests. *See* Brantingham Decl. Exs. I and T. But Plaintiff did object to several of Mayo's discovery requests. Two objections are relevant to this motion: First, Plaintiff objected to Interrogatories 13-16 because Mayo had exceeded the 25-interrogatory limit Mayo itself had requested. Second, Plaintiff objected to Mayo's Document Request No. 3 "to the extent it requests impeachment evidence." *Id.*

On August 8, Mayo's counsel sent an email raising concerns about these objections, indicating that a more detailed letter would be forthcoming. Doc. 40-1 at 38. Mayo also asked if Plaintiff was withholding documents based on objections. Plaintiff responded that "yes of course we are withholding some

19

documents based on objections." Doc. 40-1 at 36-37. Plaintiff also explicitly offered to "be available this evening" or "make time tomorrow morning" to "discuss your specific concerns," and even offered his cell number to ensure the issue could be addressed expeditiously. Doc. 40-1 at 37.

Mayo did not take Plaintiff's counsel up on his offer to have further discussions, nor did he take Plaintiff's counsel's suggestion to contact the Court to seek further guidance. Instead, in an email that was conspicuously absent from Mayo's submission at Doc. 40-1, Mayo's counsel simply replied "let's proceed with the depositions." Ex. CC at 83.

Mayo now claims "Plaintiff's counsel did not indicate that Plaintiff was withholding "impeachment" evidence," and complains Plaintiff somehow tricked it into not making "additional inquiry." Mayo Br. at 20, fn 4. This is yet another example of Mayo refusing to take an ounce of responsibility for its own actions, and is another claim that simply cannot be squared with reality. Plaintiff explicitly objected to the disclosure of "impeachment evidence" in her response to Mayo's Request for Production No. 3 – the only place Plaintiff made that objection.[4] Given that Plaintiff had been making hyper-specific allegations

---

[4]    Mayo claims the video should have been produced in response to Interrogatory No. 10 or Document Request No. 9, both of which sought "statements" as defined in Rule 26(b)(3). Mayo Br. at 14, 16. The video is not a 26(b)(3) "statement." That Rule applies to work product: "documents and tangible things that are prepared in anticipation of litigation." This was a

throughout the case about quoted language, including in explicit Requests for

Admissions, it would have been obvious to any experienced lawyer what was

going on: Plaintiff's counsel had some evidence he was planning to use to

impeach someone, and it almost certainly had to do with the assurances Plaintiff

alleged Mayo's doctors had made to Noah. Plaintiff's counsel literally invited

Mayo's counsel to conduct "additional inquiry," making himself available

morning and night (and by cell phone) in order to do so. Plaintiff's counsel also

suggested that a conference with the Court to get guidance on the issue might be

prudent. Mayo had every opportunity to conduct "additional inquiry," and

simply elected not to do so.[5]

**August 9-11:    Mayo produces another batch of documents, days before the depositions begin**

The depositions were set to begin on Monday, August 12. After the close of

business on Friday, August 9, Mayo produced another sixty-five pages of

documents. These included not only the "offer reports" that had been withheld,

---

recording Noah's mother took because she wanted to make sure she could later recall what was being said. No one was anticipating litigation. And Mayo cites no case holding that a recording of this kind is "statement" under Rule 26(b)(3).

[5]    It is also worth pointing out that in Mayo's August 9 "more comprehensive letter" outlining Plaintiff's purported discovery deficiencies, it asks for Plaintiff's discovery to be supplemented "not later than August 16, 2024." Doc. 40-1 at 44. Given that Mayo was perfectly comfortable waiting until after the depositions to get the additional information, it can hardly claim to be prejudiced by not getting the additional informatoin until after the depositions.

21

but also additional patient education materials and still more communications between Mayo doctors about Noah.

On Saturday, Plaintiff's counsel offered to find a break in the upcoming depositions to sit down with Mayo's counsel and work through the discovery issues Mayo had raised (further belying Mayo's claim that Plaintiff was trying to play "hide the ball"), and also asked Mayo to explain (a) why more unproduced documents were still being found, and (b) what was being done to make sure other relevant documents were not missed. *Id.* at 85-86. On Sunday Mayo's counsel replied that Mayo believed those most recent documents were "anomalies," but that Mayo was continuing to run additional searches. *Id.* at 87. Again, there was not a whiff of contrition and no explanation for why these additional searches had not been performed months earlier.

**August 12:**     **The depositions go forward, and Mayo continues to produce relevant documents**

As Plaintiff feared, the most recent batch of new documents were not "anomalies." When Plaintiff's counsel arrived at Mayo the morning of August 12 for the depositions, Mayo's counsel handed him yet another stack of responsive documents – again, with no explanation for the delay. The depositions went forward. Dr. Ternus was impeached.

Mayo tries to rehabilitate Dr. Ternus by pointing out that "witnesses frequently do not recall statements, made months or years earlier, verbatim." Mayo Br. at 14, fn 1. This is true, and Plaintiff would like to believe that Dr. Ternus simply forgot what he said – indeed, at some points in his testimony his answer was that he did not "recall" making certain statements – leaving open the possibility that he had said it and just didn't remember. *See, e.g.*, Ternus Dep., Doc. 29-2 at 23:11-12; 25:1-2, 13-14.

But when Plaintiff's counsel probed further, asking him if he would "deny it" or "disagree" if the family testified he had said certain things verbatim, Dr. Ternus stiffened. *Id.* at 23:6-10; 25:7-11. If he had said something along the lines of "I just really don't remember if I said that," Mayo's comment on witness memory might be valid. But Dr. Ternus went much further. He insisted, forcefully, that the things we now know without question he said were things he would not have said. *Id.* at 23:18-20; 23:24-24:1; 24:10-11; 24:18-19. This goes beyond a witness's inability to recall, "verbatim," a conversation that happened "months or years earlier." Dr. Ternus's adamance that he did not say, and would not have said, things he demonstrably did say was a falsehood, plain and simple.[6] And it was exposed through a textbook impeachment by contradiction.

---

[6]    Mayo complains it was "deprived of even a reasonable opportunity to inquire of Dr. Ternus" because Plaintiff didn't identify which of the individuals "among the many dozens who cared for Leopold over nearly a decade" had

The parties spoke with the Court that afternoon, and the depositions continued the next day.

**August 13-14:   The depositions continue, and Mayo produces still more relevant documents**

The first witness on Tuesday was Nathan Prince, a pretransplant coordinator who had been an integral part of Noah's care.[7] Before Mr. Prince's deposition began, Mayo made a record of its ongoing efforts to locate responsive documents. Prince Dep., Doc. 29-8 at 4:6-5:20. Incredibly, there was still no explanation for why all these documents had not been previously located, and no attempt to explain what was being done to make sure more weren't still being missed – beyond saying additional searches were ongoing.

---

made the assurances. Mayo Br. at 14, fn 1. Plaintiff wasn't seeking to depose "the many dozens" of doctors who had cared for Noah over a decade. Plaintiff was deposing a small handful of doctors, one of whom was Dr. Ternus. Even if Mayo hadn't talked to Dr. Ternus before it denied Plaintiff's RFAs (as it unquestionably should have), it certainly prepped him for his deposition. When it did so, is Mayo really claiming it didn't bother to mention Plaintiff's hyper-specific allegations about assurances made by Mayo doctors to Noah? If Mayo's counsel didn't "inquire of Dr. Ternus" about that when preparing him for his deposition, they have only themselves to blame.

[7]     As Mayo notes, Plaintiff produced a copy of a lengthy recorded phone conversation between Noah and Mr. Prince. Mayo Br. at 16, fn 3. Mayo surmises the reason Plaintiff produced it was because "it did not contain statements purportedly supporting Plaintiff's claims." Mayo has it exactly backwards. The Prince recording was produced because it is substantive evidence, not impeachment, and therefore not protected from disclosure.

Over the course of the three days of depositions, Mayo trickled out an additional eighteen pages of relevant documents, including highly relevant communications between providers. On several occasions, Plaintiff's counsel was handed a new sheaf of documents literally seconds before the deposition was set to begin. There was also deposition testimony that revealed, for the first time, the existence of still other relevant documents that had never been produced – some of which were only produced within the past weeks.

**August 20:  The parties meet-and-confer to work through ongoing discovery issues**

The week after the depositions, the parties had a meet-and-confer to iron out some lingering issues. Plaintiff's counsel sent an email memorializing the issues, the agreements that had been reached, and any outstanding items. Ex. CC at 88-89. Mayo also sought additional documents from the Leopold family, and Plaintiff's counsel continued to work to accommodate those requests.

**September to present:   Mayo continues to produce relevant documents, Mayo witnesses change their testimony**

To date Mayo still has provided no explanation for why responsive documents have been missed, and has not explained what is being done to make sure more documents are not still out there. Plaintiff has been seeking a 30(b)(6) deposition to sort this out, and has thus far been stiff-armed.

Since the depositions, Mayo has continued to produce more batches of responsive documents – including communications between witnesses who have already been deposed. Two of Mayo's witnesses also submitted errata sheets making fundamental changes to the substance of their testimony. Plaintiff is seeking to reconvene numerous depositions to follow up on all this new information. The parties continue to work through these issues. *See id.* at 90-96.

Plaintiff recognizes this recitation of the course of discovery to date has been long and detailed. But given the allegations Mayo is making – that Plaintiff's counsel is flagrantly abusing the discovery process – Plaintiff believes the full picture should be available to the Court. And perhaps the most enlightening part of that picture – bringing us back full circle to the central issue before the Court – is Mayo's refusal to amend its discovery responses.

Mayo now knows, beyond any doubt, that both its Answer and its responses to Plaintiff's Requests for Admissions are wrong. It has an obligation under Rule 26(e) (not to mention the Rules of Professional Conduct) to correct its misstatements, and Plaintiff has reminded Mayo of that obligation. *Id.* at 92, 100. It has now been nearly two months since Mayo became aware that its responses were wrong and must be corrected. Not only has it not done so, it has basically told Plaintiff "we'll correct the record when we're darn good and ready." *Id.* at 96. Again… at a bare minimum, Mayo should get points for audacity.

**Argument**

The core of Mayo's sanctions motion is its far-sweeping claim that "no rule or case authorizes withholding or delaying production of responsive documents for use as purported 'impeachment' evidence." Mayo Br. at 17. This claim, like Dr. Ternus's testimony and Mayo's RFA denials, is demonstrably false. Courts across the country – including in the Eighth Circuit – authorize responsive evidence to be "withheld" entirely if it is used solely for impeachment. When evidence is fairly characterized as both impeachment and substantive, courts across the country – including in the Eighth Circuit – explicitly authorize delaying production of that evidence until after depositions. And regardless of how the Court comes down on those first two issues, Mayo's motion should be denied because (a) any discovery violation – assuming there was one – was both substantially justified and harmless, and (b) Mayo's proposed remedy is both unworkable and not reasonably connected to any claimed harm.

I.     **The Ternus video did not need to be disclosed prior to Dr. Ternus's deposition because it was used "solely for impeachment."**

Impeachment, by definition, is "an attack on the credibility of a witness." *Sterkel v. Fruehauf Corp.*, 975 F.2d 528, 532 (8th Cir. 1992). One of the classic ways to impeach a witness – called "impeachment by contradiction" – is to confront a witness with evidence showing that a witness's claims are false. *Wegener v.*

27

*Johnson*, 527 F.3d 687, 691 (8th Cir. 2008). There are different ways to do this, but certainly one of the most effective is to show a video of a witness saying something he has just claimed under oath he didn't say. And "Rule 26 does not require the disclosure of evidence used solely for impeachment purposes." *Id.* at 690-91, *citing* Fed. R. Civ. P. 37(c) advisory committee's note (1993).

Mayo essentially advances two arguments on this point. First, it claims that "no case" "authorizes" a party to withhold "responsive documents for use as purported 'impeachment' evidence. Mayo Br. at 17. Second, it claims that while the Rules might exempt impeachment evidence from initial and pretrial disclosures, it does not protect impeachment evidence from a discovery request. *Id*. Neither of these arguments has merit.

### A. Contrary to Mayo's claim that "no case" authorizes withholding production of impeachment evidence, plenty of cases (in addition to *Wegener*) have held exactly that.

While Mayo may not like its language, *Wegener* plainly says "Rule 26 does not require the disclosure of evidence used solely for impeachment purposes." But *Wegener* is far from the only case supporting Plaintiff's position. It is difficult to understand how Mayo could stand by its claim that "no case" authorizes withholding the production of impeachment evidence, when even the most rudimentary legal research would have revealed that claim to be false.

28

We can start with Eighth Circuit cases. In *Richardson v. Navistar, Inc.*, the defendant served a discovery request for "all depositions of any experts retained" by certain companies. 2011 WL 150051, at *2 (E.D. Ark. April 11, 2011). The plaintiff admittedly possessed documents responsive to that request. The trial court ruled that the depositions should be produced, <u>except</u> "if [plaintiff] intends to use a deposition solely for impeachment, it need not be produced." *Id.*

In *Ragsdale v. Byassee*, the defense withheld video impeachment evidence until springing it <u>at trial</u>. 2014 WL 651260 (E.D. Mo. February 19, 2014). The trial court ruled that that was proper, and the video need not have been produced, because it was "solely for impeachment purposes" and "Federal Rule of Civil Procedure 26 does not require the disclosure of evidence used solely for impeachment purposes." *Id* at *3.

In *Mehner v. Panera, LLC*, 2023 WL 5844328 (D. Neb. September 11, 2023), the plaintiff argued she was "entitled to know, in response to written discovery, whether Defendant is planning to conduct surveillance prior to trial." *Id.* at *3. In rejecting that argument, the trial court explained that "under the federal discovery rules, Plaintiff is not entitled to discover information Defendant will use <u>solely</u> for impeachment at trial." (*Id.*, emphasis in original).

In *Ruiz v. SharkNinja Operating LLC*, 2023 WL 5153487 (M.D. Fl. August 10, 2023), the plaintiff – like Mayo did here – served a discovery request explicitly

29

asking for video recordings. Defendant was in possession of video evidence it indicated was to be used "solely for impeachment purposes." In denying Plaintiff's motion to compel – and after citing numerous cases from both the Eleventh Circuit Court of Appeals and other district courts - the trial court emphasized that because the video was to be used for impeachment purposes, it was not discoverable. *Id.* at *1.

In *Denty v. CSX Transp., Inc.*, 168 F.R.D. 549 (E.D.N.C. 1996), a plaintiff brought a motion to compel production of video surveillance material. The defendant stipulated that any such evidence would be "offered solely for impeachment purposes." *Id.* at 550. The trial court denied plaintiff's motion, because "[t]he obvious rationale for excluding impeachment materials from discovery is that their disclosure would substantially impair their impeachment value." *Id.*

In *DeBiasio v. Illinois Cent. RR.*, 52 F.3d 678 (7th Cir. 1995), the defendant tried to introduce a piece of evidence at trial that had never been disclosed. The trial court excluded it. The Seventh Circuit determined that the exclusion was an abuse of discretion, because the evidence would have been used "solely for impeachment purposes." *Id.* at 686.

Each of these cases involve a situation strikingly similar to that presented here: a party served a discovery request it claimed entitled it to impeachment

evidence, and the court concluded that the impeachment evidence was protected

from discovery. It is difficult to believe Mayo didn't find a single one of these

cases before telling this Court that "no case" "authorizes" a party to withhold

"responsive documents for use as purported 'impeachment' evidence." Mayo Br.

at 17.

> **B.**   **This Court should not follow the cases holding that impeachment material must be immediately disclosed if it is responsive to a specific discovery request.**

Plaintiff concedes that a few courts have adopted the argument Mayo is

advancing; to wit, that if evidence is responsive to a discovery request, it must be

disclosed even if it is going to be used "solely for impeachment." In Plaintiff's

view the handful of courts that have so held are wrong.[8]

In the first place, it is an illogical reading of Rule 26. Rule 26(a)(1) requires

litigants to make initial disclosures of potential witnesses and relevant evidence

at the very beginning of a case, but protects litigants from having to disclose

---

[8]   Mayo provides a list of cases it claims support its argument that evidence responsive to a discovery request must be disclosed even if it is "solely for impeachment." Mayo Br. at 19. Mayo's string cite is misleading. *Standley*, for example, didn't hold that evidence responsive to a discovery request had to be disclosed regardless of whether it was "solely for impeachment" – that issue was expressly not before the court (*see* 783 F.3d at 1282, fn 1) and the whole case turned on whether the witness's testimony was "solely for impeachment." *Id.* at 1284. *Newsome* held that impeachment-only evidence responsive to a discovery request could be withheld until after depositions. 437 F.Supp.2d at 437. *Rennenger* involved virtually no analysis whatsoever. *See* 2023 WL 7102152 at *9.

impeachment evidence or witnesses. Rule 26(a)(3) requires litigants to disclose witnesses and relevant evidence "at least 30 days before trial," but not if it is "solely for impeachment."

It would make no sense whatsoever if impeachment evidence were protected from disclosure at the beginning of the case, protected from disclosure right before trial, but fair game in the middle. Indeed, if impeachment evidence had to be disclosed in the middle of discovery there would be no point in exempting it from pretrial disclosure – any halfway competent litigant would have already ferreted out impeachment evidence by the time pretrial disclosure rolled around.

Which brings us to the second, related reason why Mayo's position (admittedly shared by some courts) is unsound. If impeachment evidence lost its protection during the middle of discovery, any litigant could eviscerate the protection against disclosure of impeachment materials by simply having a boilerplate discovery request demanding production of "any and all potentially impeaching material" and demanding identification of "any and all potentially impeaching witnesses."

Whether the Court agrees with Plaintiff on this point or not, one thing is clear: Mayo's claim that there is an "overwhelming body of case law" supporting its arguments is simply untenable. Different courts come down differently on

32

this issue. But Plaintiff believes the *Denty* court put it best: "[t]he obvious rationale for excluding impeachment materials from discovery is that their disclosure would substantially impair their impeachment value." 168 F.R.D. at 550. This Court should follow the courts that protect impeachment evidence from disclosure, even that which is responsive to a discovery request.

### C.      Plaintiff used the Ternus video solely for impeachment.

Much of the law in this area arises out of surveillance video, where a personal injury defendant uses surreptitious footage of a plaintiff to impeach his or her testimony about damages.[9] In this context, courts have wrestled mightily with the question of whether such evidence is "impeachment" or "substantive." Because these videos by their nature shed light on the subjective elements of a plaintiff's damages claims, most courts have concluded that they have both a substantive and impeachment component.

The video at issue here is fundamentally different. Literally the only purpose of the video was, and is, to objectively contradict the sworn statements

---

[9]      Surveillance video is often – though not always – taken "in anticipation of litigation" and therefore much of the case law addressing the timing of disclosure also discusses the work product doctrine. A review of those cases, however, shows that the work product doctrine is seldom a serious consideration because courts routinely determine that the opposing party has no ability to obtain the "substantial equivalent" by other means and therefore the work product doctrine is inapplicable. Despite Mayo's suggestion to the contrary (Mayo Br. at 15, fn 2), Plaintiff did not withhold this video based on a work product claim.

Mayo and its agents had made about whether <u>exact words</u> were spoken. The video was used not like a personal injury surveillance video (which is part of a much larger picture of subjective interpretation of damages), but more like a transcript of prior deposition testimony. To use just a single example to prove the point, Mayo and Dr. Ternus claimed (under oath) "we never told Noah he had 'the luxury of time.'" The video was used exclusively and explicitly to contradict that claim (and several others like it), showing that they had indeed told Noah he had "the luxury of time."

**To put it simply, if this wasn't an impeachment, what exactly would an impeachment by contradiction look like?**

Mayo spends much time discussing *Costa v. AFGO Mechanical Servs., Inc.*, claiming it "illustrates the inappropriateness of Plaintiff's purported justification for concealing the Recording." Mayo Br. at 22. *Costa* involved a recording that touched on virtually every substantive issue in the plaintiff's employment discrimination case. *See* 237 F.R.D. at 22. It did not in any way involve impeachment by contradicting exact words that a party had claimed were or were not said. Indeed, no case Mayo cites involved using a prior recording to contradict a witness's claim about specific words that were or were not said. That was the entire purpose of Plaintiff's use of this video, which is why it was used "solely for impeachment."

**II.    Contrary to Mayo's claim, courts across the country "authorize" delaying the production of evidence that has both a substantive and an impeachment component until after deposition because that is the only way to "preserve the impeachment value" of the evidence.**

In addition to its unsupportable claim that "no case" authorizes the withholding of impeachment-only evidence, Mayo also claims that "no case" authorizes "delaying production of responsive documents for use as purported 'impeachment' evidence." Mayo Br. at 17. Here again, this claim cannot be reconciled with even the most basic legal research.[10]

Courts across the country, when considering evidence that has both impeachment and substantive value, take the middle ground of requiring disclosure but only after the witness has been deposed – thereby "preserving the impeachment value of the evidence." This is an approach that has been followed by other courts in the Eighth Circuit, as recently as a few months ago. *See, e.g.,* *Kent v. Warner*, 2024 WL 3639624, at \*2 (D. Neb. July 24, 2024) (concluding that while video should be disclosed, its disclosure should be delayed until after deposition because "most courts have also recognized the impeachment value to the defendant of surveillance evidence in a case involving a plaintiff's purported injuries and have balanced these competing interests by requiring the defendant

---

[10]    Mayo's claim that "no case" authorizes "delaying production of responsive documents" is even more specious when one considers that that is exactly what was being discussed in *Costa*.

35

to disclose video surveillance only after having the opportunity to depose the

plaintiff."); *Young v. Friedel*, 2014 WL 3418891, at *2-3 (E.D. Mo. July 14, 2014)

(delaying disclosure of video evidence "allows a defendant to freely impeach a

plaintiff"); *Weisen v. Northern Tier Retail LLC*, 2021 WL 2661513, at *3-4 (D. Minn.

June 29, 2021) (noting the "impeachment purpose" of late-disclosed evidence

impeaching plaintiff's deposition testimony).

Plenty of cases from outside the Eighth Circuit also contradict Mayo's

claim that "no rule or case" authorizes the path followed here. *Kent* cites cases

from the Southern District of New York, District of Colorado, the Eastern District

of North Carolina, and the Western District of Tennessee that endorse the exact

approach Plaintiff followed here. 2024 WL 3639624, at *2. *Young* notes that there

is "no consensus among courts regarding this issue," but goes on to cite cases

from the Eastern District of Pennsylvania, the Eastern District of Missouri, the

Southern District of Ohio, and the Eastern District of Louisiana before endorsing

the approach Plaintiff followed here.

Courts across the country have followed this same path. *See, e.g., Driscoll v.
Castellanos*, 2020 WL 7711869, at *11 (D.N.M. December 29, 2020) (noting the

importance of preserving the "impeachment value" of the evidence by delaying

production); *Martino v. Baker*, 179 F.R.D. 588, 590 (D. Colo. 1998) ("To preserve

the defendant's right to use the tapes as impeachment evidence, however,

36

plaintiff's deposition is to be completed before the tapes are produced."); *Smith v. Diamond Offshore Drilling, Inc.*, 168 F.R.D. 582, 587 (S.D. Tex. 1996) (video impeachment evidence must be disclosed within thirty days after deposition); *Boyle v. CSX Transp., Inc.*, 142 F.R.D. 435, 437 (S.D.W.V. 1992) (video impeachment evidence should be disclosed "after the passage of sufficient time for deposing those surveilled"); *Bryant v. Trucking*, 2012 WL 162409, at *5-6 (D.S.C. January 18, 2012) (delaying production of impeachment video until after deposition "prevents unfair surprise while serving the truth-seeking interests of the litigation process"); *Wang v. Omni Hotels*, 2019 WL 3852590, at *9 (D. Conn. August 16, 2019) (delaying production until after deposition preserves the video "as a tool of impeachment"); *Loper v. Rapp Hydema U.S., Inc.*, 2011 WL 13353008, at *1 (S.D. Miss. February 11, 2011) (delay protects interest in "preserving the impeachment value" of the video); *Manske v. UPS Cartage*, 789 F.Supp.2d 213, 217 (D. Maine 2011) (delaying production of tape-recorded statements of witnesses in order to "preserve their impeachment value"); *Compton v. Nat'l Maintenance & Repair of Kentucky, Inc.*, 2008 WL 2959851, at *1 (S.D. Ill. July 31, 2008) ("having reviewed the cases cited by both parties, the Court finds that there is a national trend toward delaying production"); *Witman v. Knight Transportation, Inc.*, 2016 WL 9503738, at *3 (S.D. Cal. April 29, 2016) ("Many courts have also observed, however, that where surveillance evidence is intended for impeachment use at

37

trial, that such evidence not be disclosed until the defendant has been 'afforded the opportunity to take the depositions of the plaintiff and any other affected persons'") (internal citation omitted); *Finn v. BSNF Railway Co.*, 2012 WL 12547380 (D. Wyo. May 10, 2012) (noting "impeachment value" of video evidence, ordering plaintiff to appear for deposition prior to disclosure); *Young v. BC Services, Inc.*, 2011 WL 2443765, at \*2 (S.D. Ala. June 17, 2011) (delaying disclosure of telephone recordings because "if Plaintiff is provided the recordings before the deposition, the impeachment value is lost."); *Hudson v. Rhode Island Blood Center*, 2010 WL 11582976, at \*2 (D.R.I. May 25, 2010) (delaying production of Plaintiff's social media postings until after not only Plaintiff's deposition, but also Plaintiff's expert reports, to maintain "the effectiveness of the impeachment value of the documents"); *Tripp v. Severe*, 2000 WL 708807, at \*1 (D. Md. February 8, 2000) ("Courts have expressed a diversity of views as to how to resolve the issue presented by the pending motion. In the Court's judgment, the various conflicting interests presented are best reconciled by requiring a defendant to disclose the existence of the surveillance materials (as defendant has done in this case) and requiring the production of the materials prior to trial, but permitting defendant to defer production of the materials until after plaintiff's deposition has been taken."); *Blount v. Wake Elec. Membership Corp.*, 162 F.R.D. 102, 104 (E.D.N.C. September 23, 1993) (delaying production of video until

after deposition because "the timing of the disclosure mut be such that the impeachment value of the evidence is preserved").

Suffice it to say that those cases are just the tip of the iceberg. At the risk of sounding like a broken record, Mayo's sweeping statement that "no rule or case authorizes withholding or delaying production of responsive documents for use as purported 'impeachment' evidence" just cannot be reconciled with even the most cursory legal research. An easily-located case from the Southern District of Illinois, *Compton*, explicitly explained that there was a "national trend toward delaying production" as far back as 2008. Less than three months ago a court in this Circuit, *Kent*, noted that "most courts" have endorsed the approach Plaintiff followed here. And by Plaintiff's count, that approach – withholding video impeachment evidence until after the witness has been deposed in order to "preserve the impeachment value of the evidence" – has at a minimum been endorsed by federal courts in Alabama, California, Colorado, Connecticut, Florida, Georgia, Illinois, Louisiana, Maine, Maryland, Minnesota, Missouri, Mississippi, Nebraska, New Mexico, New York, North Carolina, Ohio, Pennsylvania, Rhode Island, South Carolina, Texas, West Virginia, and Wyoming.

Mayo argues that if Plaintiff was going to withhold the video pending depositions, it was incumbent upon her to seek a protective order authorizing

39

the delay in production. Mayo Br. at 23, fn 5. In the first place, Plaintiff's position was that the video was categorically exempt from disclosure and so no protective order would have been needed. But more importantly, and again contrary to Mayo's contention, in virtually all the cases cited above the issue arose after the party seeking disclosure brought a motion to compel, not on a motion for a protective order. And in many of them, like here, the deposition had already been taken when the issue was brought to the court's attention.

If there is an "overwhelming body of case law" (Mayo's words, *see* Mayo Br. at 17)[11] on anything related to this motion, it is that courts across the country routinely endorse the exact sequence of events that happened here: a party holding evidence that has impeachment value takes depositions, thereby protecting the impeachment value of that evidence, and the evidence is disclosed after that.

---

[11]   Mayo claims that "the justification offered by Plaintiff's counsel after revealing the Recording" was "a facial misapplication of the plain language of Rule 26 and a single case (*Wegener*)." Mayo Br. at 27. As should be obvious by now, Plaintiff's justification was based on much more than "a single case." Incidentally, Plaintiff's counsel offered to share his justification with Mayo's counsel during the deposition ("bring up the rule and I can show you the cases"), but Mayo's counsel was "not interested in the cases." *See* Ternus Dep. (Ex. U to Thompson Decl., Doc. 29-2) at 37:10-39:6.

**III.    Even if the Ternus video should have been disclosed earlier, no sanction is appropriate because the delay in disclosure was both substantially justified and harmless.**

It goes without saying that Plaintiff believes the timing of the production

of the Ternus video was absolutely consistent with her discovery obligations,

and with no discovery violation sanctions are a non-issue. But as Mayo

recognizes, even if the delayed disclosure was inappropriate no sanction is

warranted if Plaintiff's actions were substantially justified or harmless. Mayo Br.

at 26. Plaintiff's actions were both.

**A.    Plaintiff's decision to delay production of the Ternus video until his deposition was substantially justified.**

As outlined at great length above, Plaintiff delayed production of the

Ternus video based on her counsel's good-faith interpretation of numerous cases

from this Circuit and across the country. Mayo uses saucy language from *Vargas*

– such as "patently wrong" and "so devoid of merit as to specious" – to bolster

its claim that Plaintiff knowingly and intentionally flouted unequivocal

discovery obligations. Mayo Br. at 19, 27. But *Vargas* is a single case from a

different circuit, and (as evidenced by all the other cases Plaintiff cites in this

brief that come down differently) an outlier. Furthermore, and more importantly,

*Vargas* involved evidence that was not disclosed until it was used <u>at trial</u>. Mayo

received the Ternus video immediately after the depositions – exactly like the parties in countless cases Plaintiff cites above.

If the Court determines that the video should have been disclosed prior to Dr. Ternus's deposition, *McDaid v. Stanley Fastening Systems, LP*, 2008 WL 2928387 (E.D. Pa. July 28, 2008) is instructive on the question of sanctions. There, the defendant argued that a video tending to impeach the plaintiff's testimony need not have been disclosed prior to the plaintiff's deposition. The trial court carefully analyzed the "substantive vs. impeachment" evidence question, and ultimately determined that because the video's impeachment value was "so closely linked to its substantive value," it should have been disclosed. *Id*. at 3. When it came to sanctions, on the other hand, the court reasoned as follows:

> However, because plaintiff did not act in bad faith in refusing to disclose the video – indeed, plaintiff made a cogent argument that he had no obligation to disclose – and because plaintiff's failure need not cause prejudice, plaintiff's failure to disclose up to this point will not be held against him. Rather, he will be ordered to disclose the video as soon as it becomes available … Discovery has been re-opened, and defendant is welcome to use that reopened period, within the confines of Judge Angell's able management, to engage in appropriate discovery in preparation for the use of plaintiff's video at trial.

*Id*. The same is true here. Even if the Court decides the Ternus video should have been disclosed, the state of the law on this topic provided Plaintiff with ample justification for believing it was appropriate to withhold it. And the video was

42

produced to Mayo immediately after the deposition – just a few months after

discovery had commenced, and more than sixteen months prior to trial.

Similar guidance comes from *Newsome v. Penske Truck Leasing Corp.*, 437

F.Supp.2d 431 (D. Md. 2006), a case Mayo itself cites as support for its arguments.

*See* Mayo Br. at 19. There the Court agreed that the party "should have disclosed

the withheld evidence pursuant to [his opponent's] specific discovery request,"

but that "[g]iven the less than clear nature of the case law on this subject, no

sanctions are appropriate." *Id.* at 439.

Because Plaintiff delayed discovery of the video based on her counsel's

good-faith interpretation of the applicable rules and case law, the delay was at a

minimum substantially justified and no sanction is appropriate even if Mayo has

suffered harm. *See* Fed. R. Civ. P. 37 (… unless the failure was substantially

justified **or** harmless.") (emphasis added). But as outlined below, any harm Mayo

has suffered is entirely of its own doing.

### B.   No sanction is appropriate here because any harm to Mayo is due to its own falsehoods.

This was discussed at the beginning of Plaintiff's brief, but it bears

repeating here: the Ternus video was used to expose falsehoods being

perpetuated by Mayo and its agents. The only "harm" that resulted is that (a)

Mayo was caught red-handed, and (b) Mayo can no longer falsely deny that it

assured Noah he had the "luxury of time" to wait for the "perfect heart," and

that it assured him it would not accept a heart from a donor who had had a drug

overdose.

A recent case from this district is insightful. In *Weisen v. Northern Tier Retail*

*LLC*, 2021 WL 2661513 (D. Minn. June 29, 2021), the plaintiff brought an ADA

claim against a gas station in Bloomington. He testified in his deposition that he

and his wife were at the gas station on a certain day at a certain time. *Id*. at \*2.

The defendant then produced a surveillance video from that day and time,

directly impeaching the deposition testimony. *Id*. at \*3. Like Mayo here, Weisen

claimed the video should have been disclosed prior to his deposition because it

had both substantive and impeachment value. Weisen even cited one of the cases

Mayo cites, *Chiasson v. Zapata*. *Compare id*. at \*3 to Mayo Br. at 21-22.

Judge Ericksen pointed out that the defendant had "not offered the video

for any other purpose" than directly contradicting Mr. Weisen's deposition

testimony. *Id*. at \*4. She went on to explain – and her analysis is so on point to the

issue presented here that it is worth citing verbatim – the following:

> Furthermore, even assuming the video footage was not solely
> impeachment evidence, any late disclosure was harmless. If a failure
> to disclose is harmless, no sanction is required. Fed. R. Civ. P.
> 37(c)(1). In *Hillesheim v. Holiday Stationstores, Inc.*, the plaintiff argued
> that the district court erred when it refused to strike an affidavit,
> which the defendant had divulged for the first time in its motion for
> summary judgment. 903 F.3d 786, 790 (8th Cir. 2018). Even if the late

disclosure had violated Federal Rule of Civil Procedure 26, the court found it was harmless because the plaintiff was already aware of the information in the affidavit. *Id.* **It was the facts alleged in the affidavit, not its late disclosure, that impacted the plaintiff.** *Id.* That the plaintiff did not move for a continuance or attempt to depose the affiant earlier further "[cast] doubt on his position that timely disclosure would have made a difference." *Id.*

Here, any late disclosure was likewise harmless because Weisen knew whether he was at the Bloomington Speedway on November 21, 2019, as he repeatedly represented. Weisen claims that the late disclosure prevented him from deposing the store clerk in the video, yet Weisen should have been aware there was a clerk assisting him and could have sought discovery related to the clerk. **As in** *Hillesheim*, **it is not the video's late disclosure that harmed Weisen but the fact that the video disproves his and his wife's deposition testimony.** Additionally, Weisen failed to move for a continuance or schedule modification to attempt to depose the store clerk when Speedway disclosed the video on October 30, 2020. This casts doubt on his position that disclosure twenty-nine days earlier would have made a difference.

*Id.* at *4 (emphasis added). Just as Weisen would have known whether he was present in the gas station on the day in question or not, Mayo and its agents certainly should have been aware of the statements they themselves made to the Leopolds.[12] As in Weisen, the only "harm" to Mayo is that its claims have been categorically proven to be false.

---

[12]    As explained above, Dr. Ternus's testimony went far beyond simply not recalling what he said. *See supra* at 22-23.

45

As part of its continued effort to deflect blame for its own falsehoods, Mayo complains that Plaintiff engaged in a "deliberate scheme" to "induce Mayo or its witnesses to make statements contradicted by the Recording." Mayo Br. at 27. But this is just a more sinister-sounding way of describing what happens literally every time a lawyer conducts an impeachment by contradiction. It is hardly a novel strategy for a lawyer to lay a trap in cross-examination, drawing a witness into providing testimony that the lawyer can then prove to be false. Plaintiff did not "induce" Mayo or Dr. Ternus into making false claims any more than the Bloomington Speedway "induced" Mr. Weisen into falsely claiming he had been in the store on November 21, 2019. But when a party or witness makes claims, and the other party possesses evidence that proves those claims are false, impeachment occurs.

The bottom line is that if either Mayo or Dr. Ternus had simply told the truth, there would have been no impeachment. But because they made claims that were provable as false, they were impeached. This is exactly why courts across the country endorse the practice of withholding such evidence until a witness can be deposed, thereby "preserving the impeachment value" of the entire process.

46

## IV.   Mayo's requested relief is unworkable and not reasonably connected to the harm.

If the Court decides that Plaintiff violated the discovery rules, and if the Court decides both that there was no substantial justification and that there was harm to Mayo worthy of sanctions, Mayo's motion should still be denied. This is because its requested remedy – the total exclusion of Dr. Ternus's entire deposition from any further use in this case – is both unworkable and not reasonably connected to the harm in question.

In the first place, Mayo offers no real explanation for why Dr. Ternus's entire deposition – the vast majority of which has nothing to do with the impeachment video – should treated as if it never happened. Its rationale is that exclusion of Dr. Ternus's entire deposition "is the only way to cure the prejudice occasioned by Plaintiff's concealment of the Recording," and would "deprive Plaintiff of at least some of the benefit of her violation of the discovery rules." Mayo Br. at 30. But this argument simply doesn't follow. The prejudice Mayo suffered is that Dr. Ternus and Mayo were impeached. The benefit Plaintiff gained is that she can demonstrate that Dr. Ternus and Mayo made false statements under oath. The only logical remedy for that – assuming of course one is needed – is to preclude Plaintiff from using the part of the deposition containing the impeachment. How would excluding the parts of the deposition that are not in any way connected to the impeachment achieve either of the goals

47

Mayo outlines? Mayo doesn't say, no doubt because it would do nothing to achieve those goals.[13]

Mayo's proposed remedy is also utterly unworkable. Imagine for a moment how this would work in practice. It is beyond dispute that Dr. Ternus said what Plaintiff claims he said. Giving him the greatest benefit of the doubt, Dr. Ternus may have forgotten he said it before seeing the video. But now that he has seen the video, he – along with the Court and counsel for both sides – knows for certain he told Noah Leopold he had the "luxury of time" to wait for the "perfect heart," that Mayo would not accept a "marginal heart," and that Mayo would not accept a heart from a drug overdose donor without first discussing it with Noah.

This is important from a practical standpoint, because of how this will all play out at trial. Norman and Karen Leopold will testify to what Dr. Ternus said. When Dr. Ternus testifies under oath, he presumably will tell the truth – after all, he has seen the video and he now knows definitively that he said what he said. As long as Dr. Ternus tells the truth and acknowledges that what Norman and Karen Leopold testified to is accurate, there will be no need to impeach him and therefore no need for the video or that part of his deposition.

---

[13] As contemplated by L.R. 7.1, Plaintiff tried to engage Mayo in a good faith effort to both understand this issue and come to some reasonable compromise. *See* Ex. CC at 97, 102, 104-05. It is telling that Mayo had no interest in doing either. *Id.* at 103, 106.

The same holds true for the rest of Dr. Ternus's deposition. If he testifies at trial consistent with what he said in his deposition, there will be no need to use his deposition. <u>The only way Mayo's proposed remedy becomes an issue is if Dr. Ternus perjures himself</u>. But if he does so, the Court will know he is committing perjury. So will Plaintiff's counsel, and Mayo's counsel. Is Mayo really taking the position that Dr. Ternus can commit bald-faced perjury, and Plaintiff's counsel should be powerless to rectify that by impeaching him with his deposition? Furthermore, and even more troubling, is it really Mayo's position that its counsel (not to mention the Court) can stand by idly while Dr. Ternus knowingly perjures himself? To bring the point full circle, would Mayo claim it can double down on that falsehood by implying, or outright arguing, that Norman and Karen Leopold's testimony about what Dr. Ternus told Noah is inaccurate?

All of this, together, is the fundamental flaw in Mayo's reasoning. The only way Dr. Ternus's deposition will be used again in this case is in the unlikely event that Dr. Ternus gives false testimony at trial that must be (again) impeached by contradiction. A trial is a search for the truth, and Mayo's motion doesn't just seek to hide the truth from the jury; taken to its logical end it seeks to actively perpetuate a fraud. This is yet another reason Mayo's motion should be denied.

As for monetary sanctions, as outlined above Plaintiff's conduct was more than justifiable based on a good-faith read of applicable case law. And Mayo has cited no case, from anywhere in the country, where a court has imposed monetary sanctions on a litigant who temporarily withheld evidence like this, then disclosed it more than sixteen months prior to trial. On the other hand, Plaintiff has cited two dozen cases where courts have endorsed that exact approach.

## Conclusion

It is telling – albeit somewhat astonishing – that in the course of its thirty-three page brief Mayo does not spend one word acknowledging that it and its agents made patently false statements under oath that were exposed and still have not been corrected nearly three months later. As mentioned at the outset of this brief, Mayo's righteous indignation over a situation that is entirely of its own making takes an impressive degree of audacity.

At the end of the day, the only harm Mayo can articulate is that its mistruths – and those of its agent – were exposed. This is exactly why courts across the country endorse the approach Plaintiff followed here. If a party or a witness is going to make false statements, the other side has a right to allow them to put their falsehoods on the record and then impeach them.

50

But whether this court agrees with Plaintiff's approach or not, one thing is certain: given the language of the rules and the cases from this Circuit and across the country, at a bare minimum Plaintiff's decision to withhold disclosure of the video pending depositions was substantially justified. No sanctions are therefore appropriate, and Mayo's motion should be denied.

Dated:  October 8, 2024                    **CIRESI CONLIN LLP**

                                           By:  /s/ Brandon Thompson
                                                Brandon Thompson (#349173)

                                           225 South Sixth Street
                                           Suite 4600
                                           Minneapolis, MN  55402
                                           612-361-8200
                                           bet@ciresiconlin.com

                                           **ATTORNEYS FOR PLAINTIFF**

51

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

| | |
|---|---|
| Michelle Simha, as Trustee for the Next-of-Kin of Noah Leopold, <br><br> Plaintiff, <br><br> vs. <br><br> Mayo Clinic, <br><br> Defendant. | Civil File No. 24-CV-01097-DTS |

**Plaintiff's L.R. 7.1(f)(2) Certificate of Compliance**

The undersigned hereby certifies that Plaintiff's Memorandum in Response to Mayo's Motion for Discovery Sanctions complies with the limits of Local Rule 7.1(f) and with the type-size requirements of Local Rule 7.1(h).

This document was prepared using Microsoft Word for Office 365, and I certify that the word-count feature of the program was set to include all text – including headings, footnotes, and quotations – prior to counting the number of words in the document.

Based on the above, I certify that the document contains 11,793 words.

Dated:  October 8, 2024

**CIRESI CONLIN LLP**

By:  /s/ Brandon Thompson
     Brandon Thompson (#349173)

225 South Sixth Street
Suite 4600
Minneapolis, MN  55402
612-361-8200
bet@ciresiconlin.com

**ATTORNEYS FOR PLAINTIFF**