**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

---

Michelle Simha *as Trustee for*
*the next-of-kin of Noah Leopold*,

      Plaintiff,

v.

Mayo Clinic,

      Defendant.

Case No. 24-cv-1097 (DTS)

**ORDER**

---

**INTRODUCTION**

Plaintiff Michelle Simha, the widow of Noah Leopold, sues Defendant Mayo Clinic for medical negligence, negligent nondisclosure, and medical battery. All three claims relate to Mayo's unsuccessful transplant of Noah Leopold's heart. In the weeks leading up to Noah's heart surgery, a member of his family surreptitiously recorded a video of a conversation between Noah, his family, and a Mayo doctor, Dr. Bradley Ternus. Plaintiff first disclosed the video during the deposition of Dr. Ternus, where counsel claims to have used the recording to impeach Dr. Ternus by contradiction. Because Plaintiff did not disclose the video in her initial disclosures or in response to Mayo's discovery requests, Mayo moves for sanctions, requesting exclusion of Dr. Ternus's deposition testimony and monetary sanctions. Finding that Plaintiff's failure to disclose the video was not substantially justified and harmless, the Court grants Mayo's motion in part.

**FACTS**

**I.        General Background and the Recording[1]**

Noah received cardiac care from Mayo for years. Compl. ¶ 8, Dkt. No. 1. In August 2023, he was admitted to Mayo's cardiac intensive care unit in preparation for a heart transplant. *Id.*; Brantingham Decl., Ex. B at 7, Dkt. No. 53-1.[2] On August 16, 2023, shortly after Noah was admitted to Mayo, he and his parents, Karen and Norman Leopold, spoke in Noah's hospital room with Dr. Ternus, a cardiac intensive care unit doctor. *See generally*, Brantingham Decl., Ex. A, Dkt. No. 53 (Ternus Recording). Thompson Decl., Ex. U at 3, Dkt. No. 29-2 (Ternus Depo.). During that conversation, Dr. Ternus told the family that it just came down to waiting for an offer for transplant. Ternus Recording at 0:25–0:30. The family asked how long it would take for Noah to receive a donor heart, *id.* at 0:37–42, and several questions regarding potential donor hearts, including what information the doctors would provide Noah about any offered donor heart, *id.* at 2:30–6:17. For example, Noah's father asked how concerned Noah should be about a donor heart originating from a donor with hepatitis. *Id.* at 3:12–15. For his part, Noah expressed concerns about receiving a donor heart from a drug overdose patient. *Id.* at 3:23–3:50. Over the course of answering the family's questions, Dr. Ternus discussed (at a high level) what information Mayo would provide regarding the donor, *id.* at 2:35–4:45, and told Noah that the transplant team would not "take a marginal heart" because "we have

---

[1] Noah's medical history is complex. To resolve Mayo's motion for sanctions, only a high-level summary is needed.

[2] Page citations are to a document's CM/ECF pagination appearing in the upper right corner, not to a document's original pagination.

the luxury of time in waiting for a good one," *id.* at 5:19–5:41. Noah's mother surreptitiously recorded a video of the conversation. Brantingham Decl., Ex. B at 7.

On August 29, Mayo notified Noah that a donor heart had become available. Compl. ¶ 10. That same day, Mayo procured the donor heart and transported it to Rochester. *Id.* ¶ 13; Brantingham Decl., Ex. B at 14 (surgery scheduled to begin the night of August 29). During the surgery, the donor heart began to bleed uncontrollably. Thompson Decl., Ex. O at 16–17, Dkt. No. 28-16. The surgical team removed the donor heart and placed Noah on mechanical cardiovascular support while awaiting another donor heart. A second donor heart was procured and transplanted on September 7, 2023. Brantingham Decl., Ex. B at 23. A few days later, on September 9, Noah passed away. Compl. ¶ 17.

On March 28, 2024, Plaintiff, the trustee for Noah's next-of-kin, filed the operative three-count Complaint. Compl. ¶ 1. Count One alleges a claim of medical negligence, asserting that Mayo departed from the accepted standards of medical practice in its care and treatment of Noah. *Id.* ¶¶ 18–20. Count Two, a claim for negligent nondisclosure, alleges that Mayo failed to provide Noah with complete and accurate information regarding the risks related to his heart transplant. *Id.* ¶¶ 21–29. Count III claims medical battery, alleging that the transplant procedure Mayo performed was of a substantially different nature and character than the procedure to which Noah consented. *Id.* ¶¶ 29–33. In her Complaint, Plaintiff expressly relied upon statements made by Dr. Ternus that were captured on the video. *Id.* ¶¶ 9, 12, 30.

3

## II.        Discovery Background

In June 2024, Plaintiff provided Mayo her initial disclosures under Rule 26(a)(1)(A)(ii). Brantingham Decl., Ex. D, Dkt. No. 40-1. She identified eight categories of documents that might be used to support her claims: (1) Noah's medical records; (2) Mayo Alerts for surgery information (text messages); (3) Leopold family text messages; (4) medical bills; (5) funeral and burial expenses; (6) employment information; (7) income tax returns; and (8) sympathy cards. *Id.* at 4–5. Plaintiff did not disclose the existence of the recording in her initial disclosures. *See id.*

In July 2024, Mayo served interrogatories and requests for production of documents. Brantingham Decl., Exs. G, H, Dkt. No. 40-1. Relevant here, Mayo's discovery requests included the following:

> **INTERROGATORY NO. 7:** Describe all discussions, conversations, or statements, written or oral, made by any employee or representative of Mayo, concerning Noah Leopold's medical condition, care, services, testing, treatment, or damages from January 1, 2010 to the present.
>
> **INTERROGATORY NO. 10:** Identify any statements taken from parties or non-parties pertaining to this action. For purposes of this interrogatory, "statement" is defined as set forth in Fed. R. Civ. P. 26(b)(3).
>
> **REQUEST NO. 3:** All documents that in any way relate to the allegations and claims made in your Complaint, the incident, or the treatment in question, including, but not limited to . . . audio or video recordings . . . that relate to your allegations of negligence, causation of damages, or alleged damages incurred, and the medical care provided by Mayo.
>
> **REQUEST NO. 9:** All documents containing, referring to, or constituting any statement taken from any party or nonparty pertaining to the incident, the treatment in question, or the facts alleged in the Complaint. For purposes of this Request, "statement" has the meaning set forth in Fed. R. Civ. P. 26(b)(3).

4

Brantingham Decl, Exs. G, H. On July 31, Plaintiff responded to Mayo's interrogatories. In response to Interrogatory No. 7, she "object[ed] to this Interrogatory on the grounds that it, by its very nature, requests information that is equally under the control of Defendant." Brantingham Decl., Ex. I at 21, Dkt. No. 53-5. She did not provide a substantive response. *Id.* In response to Interrogatory No. 10, Plaintiff stated that she was "aware of no 'statements' as that term has been defined." *Id.* at 22. On August 1, Plaintiff responded to Mayo's requests for production of documents. Brantingham Decl., Ex. T, Dkt. No. 40-1. She objected to Request No. 3 on the grounds of proportionality, attorney-client privilege, the work-product doctrine, and "to the extent it requests impeachment evidence." *Id.* at 71. Subject to those objections, she produced nine documents, but not the video. *Id.* In response to Request No. 9, Plaintiff stated "See Answer to Interrogatory No. 10." *Id.* at 74.

On August 8, counsel exchanged e-mails regarding alleged deficiencies in Plaintiff's discovery responses. Mayo requested she "confirm no later than tomorrow that you have produced, and are not withholding on objection or otherwise, any and all documents, recordings, videos, or any other evidence relevant to the allegations in Plaintiff's complaint. . . . If you are unwilling or unable to provide this confirmation, Mayo reserves the right to seek appropriate remedies, which may include continuing the depositions and seeking a protective order, together with a motion to compel." Brantingham Decl., Ex. K at 30–31, Dkt. No. 40-1. Plaintiff's counsel responded, in relevant part, as follows:

> [L]et me try to directly answer one of your questions: yes of course we are withholding some documents based on objections. That's why an objection would be made. For

example, I have mountains of documents in my possession that are covered by attorney-client privilege and the work product doctrine. I have no doubt you do as well – in fact, Mayo has indicated on many occasions that it is withholding documents based on its assertion of a variety of different privileges. If you're suggesting that both sides should provide a privilege log of all the documents that are being withheld based on attorney-client and work product privileges, we can discuss that… but obviously Mayo hasn't done that, and I doubt you want to.

*Id.* at 28–29. Counsel did not disclose the existence of the recording in that e-mail exchange. *See id.* Mayo followed up with a letter on August 9, 2024, requesting supplementation of Plaintiff's discovery responses by August 16. Brantingham Decl., Ex. L, Dkt. No. 40-1.

On August 12, Plaintiff deposed Dr. Ternus. *See* Ternus Depo. During that deposition, her counsel asked Dr. Ternus whether he made certain statements to Noah and his family while they were at Mayo's intensive care unit. *Id.* at 7 (19:25) ("[Noah had] the luxury of time."), 7 (21:14–15) ("[T]he transplant team is not going to take a marginal heart for him."), 8 (22:22–24) ("[T]here are times when the transplant team is getting offers and they turn them down."), 8 (23:7–8) ("[T]hey're not going to take the first [heart] that comes along if it's questionable."), 8 (24:2–4) ("One of the things that can put a patient at risk for lower success of a transplant would be hepatitis."), 8 (24:13–15) ("[A]nyone who's had a drug overdose or something like that is considered a high-risk donor because of the lifestyle."). Dr. Ternus responded that he did not recall making those specific statements. When pressed whether the statements sounded "like the sort of thing you would have said," Dr. Ternus said no to some statements, *see, e.g., id.* at 8 (24:18–19) ("No. That does not sound like something I would have mentioned."), and yes to others,

6

*see, e.g., id.* at 7 (21:20–22) ("Q. Does that sound like the sort of thing that you would say for a patient like Noah? A. Yes."). The following exchange is illustrative:

> Q: One of the things that Noah's family is going to say that you told them is that Noah had, quote, "the luxury of time." Do you have any recollection of that?
>
> A. I do not recall saying that specifically.
>
> Q. Does that sound like the sort of thing you would have said?
>
> A. Generally I would say no.
>
> Q. Okay. If Noah's folks testify under oath that you told them that – or told Noah that, what are you going to say in response to that?
>
> . . .
>
> A. I do not recall having that specific conversation.
>
> Q. Fair enough. Sometimes people say, "I don't remember that and, boy, if I would have said that, I'd remember it, so I don't think it happened." And sometimes people say, "I don't remember saying that, but it's entirely possible that I did say it." Which one of those two camps do you think you're closer to with respect to the question of whether you said, "Noah, you've got the luxury of time?"
>
> . . .
>
> A.  Generally I'd consider it unlikely –
>
> Q. Okay.
>
> A. – I would say something like that.

*Id.* at 7 (19:23–21:4). Plaintiff's counsel then proceeded to show Dr. Ternus the video recording and question him about it. *Id.* at 11–15. Mayo was not aware of the recording's existence prior to Dr. Ternus's deposition. *See id.* at 11 (37:15–17). The recording shows Dr. Ternus making the aforementioned statements to Noah and his family. *See* Ternus

7

Recording. On October 1, 2024, Mayo moved for sanctions, claiming that the failure to disclose the recording violated discovery rules. Mayo's Mem. in Supp. of Mot. for Sanctions, Dkt. No. 39 (Mayo's Sanctions Mem.).

**ANALYSIS**

### I.    Sanctions

Mayo moves for sanctions under Federal Rule of Civil Procedure 37. Mayo's Sanctions Mem. at 25–29. Rule 37 "gives a district court broad authority to impose sanctions for failure to respond to discovery requests or to disclose information required by Fed.R.Civ.P. 26(a)." *Collins v. Burg*, 169 F.3d 563, 565 (8th Cir. 1999). Rule 37(c) applies "[i]f a party fails to provide information . . . as required by Rule 26(a) or (e)." Fed. R. Civ. P. 37(c)(1). Rule 26(a)(1) requires litigants to make certain initial disclosures.[3] Relevant here, Rule 26(a)(1)(A)(ii) requires a party to provide: "a copy—or a description by category and location—of all documents, electronically stored information, and tangible things that the disclosing party has in its possession, custody, or control and may use to support its claims or defenses, unless the use would be solely for impeachment." Rule 26(e)(1)(A) requires a party to supplement or correct initial disclosures and discovery responses "in a timely manner if the party learns that in some material respect the disclosure or response is incomplete or incorrect, and if the additional or corrective information has not otherwise been made known to the other parties during the discovery process or in writing."[4] If a party fails to disclose information in violation of Rule 26(a) or (e), "the party is not allowed to use that information . . . unless the failure

---

[3] Rule 26(a)(2)'s expert-disclosure requirements and Rule 26(a)(3)'s pretrial-disclosure requirements are not applicable here.

[4] Rules 26(e)(1)(B) and 26(e)(2) are likewise not applicable here.

was substantially justified or is harmless." Fed. R. Civ. P. 37(c)(1). Courts may impose other sanctions "[i]n addition to or instead of" excluding the undisclosed evidence. *Id.*

Mayo also seeks sanctions under Rule 37(a)(5). Mayo's Sanctions Mem. at 25–26. Rule 37(a) relates to motions to compel disclosure or discovery. "If the motion is granted—or if the disclosure or requested discovery is provided after the motion was filed—the court must . . . require the party . . . to pay the movant's reasonable expenses." Fed. R. Civ. P. 37(a)(5)(A). Because Mayo has not filed a motion to compel, and Plaintiff has already turned over the recording, Rule 37(a)(5), by its terms, does not apply.[5]

## A.    Initial Disclosures and Discovery Requests

The first step in resolving Mayo's motion for Rule 37(c)(1) sanctions is determining whether Plaintiff failed to provide information as required by Rule 26(a) or (e). Plaintiff does not dispute that, at the time of her initial disclosures, the recording of Dr. Ternus was in her possession and that she might use it to support her claims. *See generally* Pl.'s Mem. in Resp. to Mayo's Mot. for Sanctions, Dkt. No. 57 (Pl.'s Sanctions Resp.). This makes sense given that she quoted statements captured on the recording in her

---

[5] This observation might seem utterly perverse—one who conceals the existence of a document so as to forestall a motion to compel is better off—i.e. not subject to sanction under Rule 37(a)—then one who discloses its existence but improperly withholds it? The answer to this seeming perversity is that the Court has the inherent authority to sanction discovery abuse even if that conduct does not fall within the express terms of Rule 37(a). Chambers v. NASCO, Inc., 501 U.S. 32, 50 (1991) ("[T]he court ordinarily should rely on the Rules rather than the inherent power. But if in the informed discretion of the court, neither the statute nor the Rules are up to the task, the court may safely rely on its inherent power."). Mayo does not argue that the Court should sanction Plaintiff by relying on its inherent authority, *See generally* Mayo's Sanctions Mem, but that Plaintiff's failure to disclose the recording in response to its discovery requests triggers sanctions under Rule 37(a). But, as previously noted, Rule 37(a) only applies, by its terms, where a party has moved to compel discovery. In this case, because the Court finds sanctions appropriate under Rule 37(c) it need not rely upon its inherent authority. Were it to do so, however, the result would be the same.

Complaint. *See, e.g.*, Compl. ¶ 9 ("As part of preparing Mr. Leopold for his transplant, Mayo made assurances to him. Mr. Leopold was told that he had the luxury of time, and the Mayo team assured him they would not accept a substandard heart for his transplant."). Further, video and audio recordings, such as the recording of Dr. Ternus, are electronically stored information subject to Rule 26(a)(1)(A)(ii). *Merechka v. Vigilant Ins. Co.*, 26 F.4th 776, 788 (8th Cir. 2022) (applying Rule 26(a)(1)(A)(ii) to videos); *Schaffer v. Beringer*, No. 4:14-CV-04138, 2014 WL 7181022, at *3 (D.S.D. Dec. 16, 2014) (same); *see also* Fed. R. Civ. P. 26 advisory committee's note to 2006 amendment ("The term 'electronically stored information' has the same broad meaning in Rule 26(a)(1) as in Rule 34(a)."); *Allen v. Hays*, 812 F. App'x 185, 191 (5th Cir. 2020). Plaintiff raises no argument to the contrary. *See generally* Pl.'s Sanctions Resp.

Moreover, the recording is responsive to Mayo's discovery requests. First, Mayo's Interrogatories No. 7 and 10 requested information regarding statements by Mayo employees in Plaintiff's possession. The rules define "statement" to include recordings. The recording at issue is responsive to these interrogatories. Similarly, Mayo's Request for Production of Documents expressly demanded production of this recording. Brantingham Decl., Ex. G at 11. There is no tenable argument that the recording is not within the purview of Mayo's discovery requests.[6] Plaintiff did not produce the recording or disclose its existence in response to these discovery requests.

---

[6] Mayo defined statement by incorporating the definition of statement set forth in Rule 26(b)(3)(C). Under the plain language of Rule 26(b)(3)(C), the recording of Dr. Ternus is "a contemporaneous . . . recording . . . that recites substantially verbatim [Dr. Ternus's] oral statement." Fed. R. Civ. P. 26(b)(3)(C); *see also London Luxury, LLC v. Walmart, Inc.*, No. 5:22-CV-5059, 2024 WL 1055731, at *3 n.4 (W.D. Ark. Mar. 10, 2024) ("To the extent this Zoom interview was recorded (which is not mentioned in the summary), Walmart must produce a copy of the recording. Fed. R. Civ. Proc. 26(b)(3)(C).");

The question then becomes whether Plaintiff's failure to provide or identify the recording in her discovery responses triggers Rule 37(c)(1), which only applies "[i]f a party fails to provide information . . . as required by Rule 26(a) or (e)." Fed. R. Civ. P. 37(c)(1). Mayo only appears to argue for Rule 37(c)(1) sanctions predicated on a violation of Rule 26(a), not Rule 26(e). *See* Mayo's Sanctions Mem. at 26. This makes sense. Rule 26(a) governs initial disclosures, not discovery responses. Though Rule 26(e)(1) concerns discovery responses, it is directed to supplementation thereof: a party "who has responded to an interrogatory, request for production, or request for admission" must "supplement or correct its disclosure or response . . . in a timely manner if the party learns that in some material respect the disclosure or response is incomplete or incorrect[.]" Here, Plaintiff intentionally withheld the recording at the outset of the case but only a few weeks passed between her discovery responses and Dr. Ternus's deposition, when the recording was used. This fact pattern does not seem to fit within Rule 26(e)(1) and, though neither party addresses the issue, the Court is aware of no authority to establish that Plaintiff's conduct violated her duty to supplement discovery. Accordingly, the Court

---

*Incompass IT, Inc. v. XO Commc'ns Servs., Inc.*, No. 10-cv-3864, 2011 WL 13233488, at *3 (D. Minn. Nov. 14, 2011) (concluding that a transcript of a surreptitious recording should have been disclosed pursuant to Rule 26(b)(3)(C)); *Costa v. AFGO Mech. Servs., Inc.*, 237 F.R.D. 21 (E.D.N.Y. 2006) ("[T]here is no question that all audiotape recorded statements by defendants which concern the subject matter of the litigation qualify as party statements and must be produced under Rule 26(b)(3)."); *Smith v. WNA Carthage, L.L.C.*, 200 F.R.D. 576, 578 (E.D. Tex. 2001) ("[A] statement of an employee is discoverable as a matter of right if the statement would be admissible against the employer corporation as a vicarious admission."). Plaintiff argues that the recording is not a statement as defined by Rule 26(b)(3)(C) because the recording was not prepared in anticipation of litigation. Pl.'s Sanctions Resp. at 20 n.4. This argument is contrary to the plain text of Rule 26(b)(3)(C), which does not limit the definition of statement to something prepared in anticipation of litigation. Nor does Plaintiff cite any authority to support this argument.

confines its analysis to whether sanctions are appropriate under Rule 37(c)(1) for Plaintiffs' failure to identify the recording in her initial disclosures.

### B.    The Impeachment Exception

Plaintiff argues she did not violate Rule 26(a)(1)(A)(ii) because the recording falls under the impeachment exception to the disclosure requirement. Pl.'s Sanctions Resp. at 33–34. Rule 26(a)(1)(A)(ii) requires the disclosure of electronically stored information that the disclosing party "may use to support its claims or defenses, unless the use would be **solely for impeachment**." Fed. R. Civ. P. 26(a)(1)(A)(ii) (emphasis added); *see also Wegener v. Johnson*, 527 F.3d 687, 690 (8th Cir. 2008) ("Rule 26 does not require the disclosure of evidence used solely for impeachment purposes.").[7] Plaintiff argues that it is the offering party's subjective intent that controls the scope of the impeachment exception. Relatedly, she contends that "the only purpose of the video was, and is, to objectively contradict the sworn statements Mayo and its agents had made about whether exact words were spoken." *Id.* Accordingly, Plaintiff argues either the recording lacks any substantive value, or regardless of any substantive value it may have, she used it solely to impeach Dr. Ternus and it therefore was not subject to disclosure under Rule 26(a)(1)(A)(ii). Finally, Plaintiff also argues that courts routinely permit parties to delay the production of impeachment evidence that has a substantive component until after the witness's deposition. *Id.* at 35–40. For the reasons discussed below, the Court finds that the impeachment exception to the initial disclosure requirement does not apply.

---

[7] The Parties also dispute whether Plaintiff was entitled to withhold the recording as impeachment evidence in response to Mayo's discovery requests. Even assuming such an exception exists, however, the recording would not come within it for the reasons discussed below.

The Eighth Circuit has not addressed the scope of Rule 26(a)'s impeachment evidence exception. Other Circuits have. In *Standley v. Edmonds-Leach*, the D.C. Circuit Court of Appeals surveyed how courts have interpreted Rule 26(a)'s impeachment exception. 783 F.3d 1276 (D.C. Cir. 2015). It observed that "some courts have concluded that the impeachment exception is limited to evidence that has no potential utility other than impeachment." *Id.* at 1283; *Slavin v. Garrison Prop. & Cas. Ins. Co.*, 805 F. App'x 561, 568 (10th Cir. 2020) ("[W]e have suggested that the evidence should have no substantive value."); *Olivarez v. GEO Grp., Inc.*, 844 F.3d 200, 204 (5th Cir. 2016) ("This Court has made clear that some evidence serves both substantive and impeachment functions and thus should not be treated as 'solely' impeachment evidence."); *Klonoski v. Mahlab*, 156 F.3d 255, 270 (1st Cir. 1998) ("[T]he weight of authority seems to be that [surveillance footage] evidence is both impeaching and substantive and should be disclosed."). Under this approach, courts consider whether the evidence has substantive value, not how a party uses or intends to use it.

Other courts have employed a more subjective test, reasoning that a party may withhold evidence "with both impeachment and substantive qualities . . . so long as it is strictly used to impeach." *Standley*, 783 F.3d at 1283 (citing *DeBiasio v. Illinois Cent. R.R.*, 52 F.3d 678, 686 (7th Cir. 1995)). To be clear, courts following this latter approach are far from uniform—they do not adopt a singular test. The only consistent throughline to these cases is their rejection of the "proposition that 'solely' means that the evidence can have no substantive non-impeachment value." *Id.* at 1283–84. Explaining the basis for this more flexible approach, one court reasoned that the stricter, objective approach "would result in an erosion of evidence capable of warranting the impeachment

13

designation" because "[i]t is the rare case where an attack on a witness's credibility cannot be linked to some substantive element of a claim." *Halbasch v. Med-Data, Inc.*, 192 F.R.D. 641, 649–50 (D. Or. 2000). Courts following the flexible approach focus more on the purpose for which the evidence or testimony is offered, giving some weight to the offering party's claimed subjective intent. *See, e.g.*, *Halbasch*, 192 F.R.D. at 649 (attaching significance "to the offering party's intent and designation, regardless of the coexistence of a substantive element"); *Alphonso v. Esfeller Oil Field Const., Inc.*, 380 F. App'x 808, 810 (11th Cir. 2010) (finding that although surveillance footage had substantive value, "the record demonstrates that the video was admitted solely to impeach Alphonso's testimony").

But even following this more flexible approach, courts also tend to consider whether the "impeachment purpose of the evidence" can "be separated" from the evidence's substantive qualities. *Williams v. Devlin*, 142 F. Supp. 3d 76, 79 (D.D.C. 2015). For example, four years after it decided *DeBiasio*, the Seventh Circuit affirmed a trial judge's rejection of a claim that individuals would be called to testify "solely for impeachment" purposes, reasoning that "[t]he proposed . . . testimony was part of AM General's primary line of defense." *Wilson v. AM Gen. Corp.*, 167 F.3d 1114, 1122 (7th Cir. 1999). Likewise, in *Williams v. Devlin*, a court reasoned that even applying the more flexible standard, a jacket should be excluded because "[t]he impeachment purpose of the evidence—discrediting Defendants' testimony that they did not kick Plaintiff—cannot be separated from the 'substantive qualities' of the evidence because the allegation that Defendants assaulted Plaintiff is integral to Plaintiff's claims in this case." *Williams*, 142 F. Supp. 3d at 79. Under either approach, the D.C. Circuit surmised, "courts have focused

14

on the word 'solely' and our sister circuits have read that term strictly." *Standley*, 783 F.3d at 1283.

A survey of cases from district courts sitting in Circuits without binding authority tracks the D.C. Circuit's analysis; most courts applying Rule 26(a)'s impeachment exception have concluded that the exception does not encompass evidence with significant substantive value. *McDaid v. Stanley Fastening Sys., LP*, No. CIV. 07-709, 2008 WL 2928387, at *1 (E.D. Pa. July 28, 2008) ("[W]here a piece of evidence cannot be realistically confined to use for impeachment purposes, it must be disclosed."); *Toth v. Cal. Univ. of Pa.*, No. CIV.A. 09-1692, 2012 WL 951790, at *1 (W.D. Pa. Mar. 20, 2012) ("[I]f the impeachment evidence could have been offered for substantive purposes, it violates the disclosure requirement of Rule 26."); *Davis v. Varlack Ventures, Inc.*, 59 V.I. 229, 234–35 (V.I. 2013) ("Where a party can use evidence for both impeachment and substantive purposes, it does not fall under the exception for evidence that is *solely* for impeachment."); *Burdyn v. Old Forge Borough*, 330 F.R.D. 399, 407–412 (M.D. Pa. 2019) (following a flexible approach); *Newsome v. Penske Truck Leasing Corp.*, 437 F. Supp. 2d 431, 436 (D. Md. 2006) ("Impeachment evidence which also possesses a substantive quality cannot be said to fit the *solely for impeachment* classification."); *Morris v. Metals USA*, No. 2:09-CV-1267, 2011 WL 94559, at *6 (D.S.C. Jan. 11, 2011) (rejecting "defendant's threadbare argument that it simply made a determination that the identity of the investigator and the surveillance videotape were only to be used for impeachment purposes; therefore, no disclosure was necessary"); *Bryant v. Trucking*, No. 4:11-CV-2254, 2012 WL 162409, at *5 n.3 (D.S.C. Jan. 18, 2012) ("District courts within this circuit have found that impeachment evidence must be produced whenever the evidence also

has a substantive purpose."); *Exclaim Mktg., LLC v. Directv, LLC*, No. 5:11-CV-684-FL, 2014 WL 12626359, at *3 (E.D.N.C. Nov. 18, 2014) (same); *Toliver v. JBS Plainwell, Inc.*, No. 1:11-CV-302, 2014 WL 359494, at *3 (W.D. Mich. Feb. 3, 2014) ("If a document has some impeachment value, but also has independent relevance to the merits of the case, the document is not 'solely' for impeachment and must be disclosed."); *Roach v. Hughes*, No. 4:13-CV-00136, 2015 WL 13548427, at *4 (W.D. Ky. Aug. 4, 2015) (finding the Fifth Circuit's approach persuasive); *Stryker Corp. v. Ridgeway*, No. 1:13-CV-1066, 2016 WL 6583592, at *8 (W.D. Mich. Feb. 16, 2016) ("If a document has some impeachment value, but also has independent relevance to the merits of the case, it is not being used 'solely' for impeachment."); *Watts v. Carroll Cnty. Fiscal Ct.*, No. 3:16-CV-00040, 2017 WL 6045939, at *1 (E.D. Ky. Aug. 17, 2017); *Wegner v. Cliff Viessman, Inc.*, 153 F.R.D. 154, 159 (N.D. Iowa 1994) ("[F]ind[ing] that the weight of authority favors discoverability of surveillance information, principally because such information is probative of a critical issue."); *Blair v. Crown Point Resort, Inc.*, No. 1:12-CV-00110, 2014 WL 2204093, at *5 (E.D. Ark. May 27, 2014) ("[E]vidence that could be used for substantive purposes must be disclosed."); *FA ND Chev, LLC v. Kupper*, No. 1:20-CV-138, 2023 WL 5822419, at *3 (D.N.D. July 31, 2023) ("[B]y its very nature, contradictory evidence cannot be used solely to impeach."); *Derouin v. Kenneth L. Kellar Truck Line, Inc.*, No. C08-1049, 2010 WL 11684278, at *3 (W.D. Wash. Nov. 8, 2010) ("Where material contains both substantive and impeachment evidence, it is not 'solely for impeachment' and must be disclosed."); *Robert Kubicek Architects & Assocs., Inc. v. Bosley*, No. CV-11-01945, 2013 WL 998222, at *2 (D. Ariz. Mar. 13, 2013) ("A document used 'solely for impeachment' within the meaning of the rule is a document which has

16

value solely for the purpose of impeaching a witness."); *Clear-View Techs., Inc. v. Rasnick*, No. 13–CV–02744, 2015 WL 3509384, at *6 (N.D. Cal. June 3, 2015) (same); *Deutsche Bank Nat'l Tr. Co. v. Seven Hills Master Cmty. Ass'n*, No. 215CV01373, 2016 WL 1639885, at *2 (D. Nev. Apr. 25, 2016) (finding that evidence with "independent relevancy to the merits of the case" did "not fall within the 'solely for impeachment' exception"); *Walsh v. LG Chem Am.*, No. CV-18-01545, 2021 WL 4167310, at *8 (D. Ariz. Sept. 14, 2021) ("[I]f evidence has both impeachment and substantive purposes, it must be disclosed."); *Equal Emp. Opportunity Comm'n v. St. Joseph's/Candler Health Sys., Inc.*, No. CV420-112, 2022 WL 17978822, at *7 n.3 (S.D. Ga. Dec. 28, 2022) (evidence that has both impeachment and substantive purposes must be disclosed); *Hicks v. United States*, 85 Fed. Cl. 634, 635 (Fed. Cl. 2009) ("Because the discovery exceptions apply only if the evidence is 'solely' for impeachment, evidence that serves both impeachment and substantive purposes falls outside these exceptions.").

There are opinions going the other way. More than a handful of courts have found that a party was not required to disclose evidence or testimony even though the offered evidence or testimony contained meaningful substantive value. *See, e.g.*, *Ragsdale v. Byassee*, No. 1:11CV 200, 2014 WL 651260, at *4 (E.D. Mo. Feb. 19, 2014) ("[T]he undersigned determined that defense counsel's intended use of the [surveillance] video was for impeachment purposes."); *Classic Soft Trim, Inc. v. Albert*, No. 618CV1237, 2020 WL 13824059, at *3 (M.D. Fla. Dec. 2, 2020) (finding that a recording did not have to be disclosed despite the contents being detailed in the complaint's factual allegations); *Calhoun v. Walmart Stores East, LP*, 818 F. App'x 899, 901 (11th Cir. 2020) (finding that Walmart was not required to disclose a personal injury plaintiff's Facebook posts

17

"because it used this evidence solely for the purpose of impeaching her testimony that she was unable to work after the incident.").[8] Some of these courts appear to have been particularly deferential to the offering party's claimed subjective intent. *See, e.g.*, *Ruddell v. Weakley Cnty. Sheriff's Dep't*, No. 1:07-CV-01159, 2009 WL 7355081, at *1 (W.D. Tenn. May 22, 2009) (finding that a defendant was not obligated to disclose recordings with substantive value because "Rule 26 disclosures hinge on the disclosing party's intended use of the evidence."). Other courts applying the more flexible approach appear to focus on how counsel actually used the evidence, rather than on their stated intent. *See, e.g.*, *Ragsdale*, 2014 WL 651260, at *4 ("[T]he undersigned *determined*. . .") (emphasis added); *Calhoun*, 818 F. App'x at 901 (concluding that Walmart used the evidence solely to impeach). What factors these courts weighed to determine that the evidence was used *solely* for impeachment despite its substantive value, is unclear. Regardless, none of these cases adopted a bright line rule that the offering party's subjective intent controls.

In short, the weight of persuasive authority does not support Plaintiff's broad view of the impeachment exception—that her subjective intent controls regardless of the substantive value of the evidence. Even those cases that could be read to support her position have not expressly adopted such an expansive rule. *Wright & Miller* persuasively explains why such a broad impeachment exception is untenable:

> Though the issue is usually posed in general terms as relating to any discovery of material with which the opponent plans to impeach the discovering party or his witnesses, in practice it

---

[8] Other courts have concluded that evidence or testimony was introduced for the sole purpose of impeachment with limited discussion, leaving it difficult to ascertain their reasoning or the substantive value of the offered evidence or testimony. *See, e.g.*, *Ling-Rong Chen v. City of Syracuse*, 385 F. App'x 41, 42 (2d Cir. 2010).

is much narrower. For example, a statement of a party, although in theory competent evidence as an admission of a party opponent, is most often used to impeach the party by a showing of inconsistency. Rule 26(b)(3) recognizes that such a statement is always obtainable by the person who made it. If a party plans to testify to one version of the facts, and the opponent has evidence supporting a different version of the facts, the opponent's evidence will tend to impeach the party by contradiction, but if discovery of this kind of evidence is not permitted the discovery rules might as well be repealed. Even those who have been most concerned about protecting impeachment material recognize that substantive evidence must be subject to discovery even though it also tends to contradict evidence of the discovering party.

8 Charles A. Wright & Arthur R. Miller et al., *Federal Practice & Procedure: Civil* § 2015 (3d ed. June 2024 update). In other words, because almost all contradictory evidence has some impeachment value, allowing parties to withhold such evidence based on their stated subjective intent regardless of its substantive value or how the evidence is in fact used, would permit the type of gamesmanship that the discovery rules seek to prevent. Fed. R. Civ. P. 26 advisory committee's note to 1993 amendment ("The litigants should not indulge in gamesmanship with respect to the disclosure obligations."); *see also Standley*, 783 F.3d at 421 (recognizing that Rule 26(a)'s automatic disclosure requirement "was adopted to end two evils that had threatened civil litigation: expensive and time-consuming pretrial discovery techniques and trial-by-ambush" (quoting *Hayes v. Cha,* 338 F.Supp.2d 470, 503 (D.N.J. 2004))). To the extent a handful of cases could be read to support Plaintiff's position, the Court does not find them persuasive.

Even if this Court were to adopt the more flexible minority approach to the impeachment exception, the Court would nonetheless find the exception does not apply in this case. To recap, Plaintiff's counsel asked Dr. Ternus whether he had made certain statements. Ternus Depo. at 7–10. Dr. Ternus could not recall making the statements

and testified that some of the statements did not sound like something he would said. *Id.* Counsel then played the recording, which showed Dr. Ternus making these precise statements. *See generally* Ternus Recording. To the extent Dr. Ternus testified that certain statements did not sound like something he would say, counsel impeached Dr. Ternus by contradiction (although a reasonable person could believe Dr. Ternus's answers were honest).

But it is equally clear that the at-issue statements are important to the merits. The recording establishes, for example, that Dr. Ternus told Noah he had the "luxury of time." Ternus Recording at 5:38–40. Under Federal Rule of Evidence 801(d)(2)(D), Dr. Ternus's statements are not hearsay, and therefore could be relied upon for the truth of the matters asserted. The existence and truth of that statement are relevant to the merits; Plaintiff alleges in her Complaint that Mayo "knew, or should have known, that waiting to procure a different heart was a viable alternative to moving forward with the attempted heart transplant on August 29." Compl. ¶ 23. She also alleges that this assurance was "extremely important to Mr. Leopold, who was well-versed in the various aspects of the transplant." *Id.* ¶ 9. Because Dr. Ternus's luxury-of-time statement has meaningful substantive value that cannot reasonably be separated from the statement's impeachment value, counsel could not—and did not—solely use the recording to impeach Dr. Ternus.

Counsel's subsequent line of questioning confirms this:

> Q: The reason you would have told Noah, not once but twice, "we want to get you the perfect heart," is back to that issue where he's got the luxury of time to wait; right?
>
> A. I always want to do the best for all my patients.

20

Q. I get that. But Noah is a patient that could have waited to get the perfect heart; right?

. . .

A. He was stable in the ICU.

Q. With respect, that – that wasn't my question. You – These are your words. Not mine. Not Noah's. Not Norman Leopold's. These are your words. Not once but twice you talked about getting Noah the perfect heart. What did you mean by that?

A. A heart that is the – right for him.

Q. Can you and I agree that a heart from a convicted felon, meth addict, who died of an intracranial hemorrhage from a drug overdose, who is a pack-and-a-half-a-day smoker, who was an alcoholic, whose heart was way bigger than Noah's, who had MDMA, fentanyl, meth, weed, all in his system at the time that he died, and this heart was going to be transported from the other side of the country on a machine where 20 percent of the hearts end up failing by the time they get to the other end, can you and I agree that that wasn't quite the perfect heart?

. . .

A. After the fact, we can say it was not a perfect heart.

Ternus Depo. at 15 (50:21–52:6).

This exchange not only highlights the importance of the luxury-of-time statement, among others, to the merits, but also illustrates that the questioning went beyond use of the recording to impeach Dr. Ternus. Other at-issue statements are likewise substantively significant. For example, when asked if he would have told the family that someone who has had a drug overdose is considered a high-risk donor, Dr. Ternus testified that did not sound like something he would have mentioned. Ternus Depo. at 8 (24:12–19). However, the recording captures Dr. Ternus telling Noah "anyone who's, you know, had a drug overdose or something like that is considered a high-risk donor just because of the

21

lifestyle." *Id.* at 14 (49:3–6). Whether Mayo should have informed Noah that his donor died of a drug overdose is an important issue in this case. In short, the recording has meaningful substantive value, and even if this Court were to adopt a more flexible approach to Rule 26(a)'s impeachment exception, the substantive value of the statements cannot reasonable separated from their impeachment value, which were not used *solely* to impeach in any event.

There's more. Counsel played the entire six-minute video, not just the specific segments that contradicted Dr. Ternus's testimony. Much of the recording contained significant substantive value that was not used for impeachment. For example, Dr. Ternus assured Noah that "[t]hey're not going to take a marginal heart," Ternus Recording at 5:16–22. Plaintiff alleges this is one of the assurances that led Noah to consent to the heart transplant. *See* Compl. ¶ 30. But Dr. Ternus had already conceded that the marginal-heart statement sounded like the sort of thing he would have told a patient like Noah. Dr. Ternus Depo. at 7 (21:20–22). Later in the deposition counsel questioned Dr. Ternus extensively about this marginal-heart statement. *See* Ternus Depo. at 18–20 (64:1–71:18). Therefore, playing that portion of the video had little to no impeachment value, while establishing that Dr. Ternus in fact had made this statement that is salient to the merits.

Similarly, on the recording, Noah asks Dr. Ternus about risk factors and expresses his concern about receiving a heart from a donor who had died from a drug overdose. Ternus Recording at 3:23–50. Counsel likewise questioned Dr. Ternus about the import of Noah's drug-related inquiries. *Id.* at 14 (46:9–47:10). Plaintiff's negligent nondisclosure claim rests, in part, on the theory that doctors were required to disclose that the donor

22

was a drug user because Mayo knew Noah would have found that information significant. Proposed Am. Compl. ¶¶ 14, 44 Dkt. No. 66. Because Dr. Ternus testified that "[he] wouldn't deny" that this exchange occurred, Ternus Depo. at 8 (25:7–14), playing that portion of the recording had no impeachment value, while establishing relevant facts for trial. Because the recording is not solely impeachment evidence, and was not used solely to impeach Dr. Ternus, the impeachment exception of Rule 26(a)(1)(A)(ii) did not exempt the recording from disclosure

Plaintiff's final argument justifying her decision not to disclose the recording is that "[c]ourts across the country, when considering evidence that has both impeachment and substantive value, take the middle ground of requiring disclosure but only after the witness has been deposed." *Id.* (collecting cases). According to Plaintiff, most courts have endorsed the approach she followed here. The Court disagrees.

In general, Plaintiff's cases involve one of two circumstances—either a party has moved for a protective order to delay the disclosure of evidence to preserve its impeachment value, *Manske v. UPS Cartage Servs., Inc.*, 789 F. Supp. 2d 213, 218 (D. Me. 2011); *Compton v. Nat'l Maint. & Repair of Ky., Inc.*, No. 3:07-CV-170, 2008 WL 2959851, at *2 (S.D. Ill. July 31, 2008); *Young v. BC Servs., Inc.*, No. CIV.A. 10-00429, 2011 WL 2443765, at *1 (S.D. Ala. June 17, 2011), or the opposing party has moved to compel the evidence and the possessing party has asked to delay its production to preserve its impeachment value. *See, e.g.*, *Kent v. Warner*, No. 8:23CV3059, 2024 WL 3639624, at *2–3 (D. Neb. July 24, 2024). As one court explained in the context of surveillance footage, "[t]his approach allows a defendant to freely impeach a plaintiff regarding any and all alleged injuries, while also providing plaintiff with an adequate

23

opportunity to review any inconsistencies between his testimony and the video prior to trial." *Young v. Friedel*, No. 4:14-CV-499, 2014 WL 3418891, at *3 (E.D. Mo. July 14, 2014).

Plaintiff's argument glosses over a key distinction between the "delayed production" cases and this case. In the delayed production cases the existence of a video is known to the other party. Had Plaintiff disclosed the existence of the video but withheld it from production either party could have presented the issue to the Court. In that circumstance, the cases Plaintiff cites might have been informative. But that is not what happened. Here, Plaintiff unilaterally decided the video was exempt from initial disclosure. She did not move for a protective order to delay production of the recording—nor put Mayo on notice so that it could move to compel prior to Dr. Ternus's deposition.[9] The issue now is simply whether Plaintiff was correct. Stated otherwise, the question whether Plaintiff followed "the proper procedure" by producing the video at the deposition is just another way of asking whether the video was exempt from disclosure in the first place. The existence of a procedure that Plaintiff did not invoke (and by her decision forestalled) is irrelevant.

Courts, not parties, decide whether it is appropriate to delay production of evidence that has both impeachment and substantive value. This is particularly true for Rule 26(a)

---

[9] A party can only reasonably move to compel when the opposing party identifies the existence of undisclosed evidence or when the party is aware that undisclosed evidence is likely to exist. *See, e.g.*, *Tripp v. Severe*, No. CIV.-99-1478, 2000 WL 708807, at *1 (D. Md. Feb. 8, 2000) ("Defendant disclosed the existence of these surveillance videotapes in response to an interrogatory propounded by plaintiff."); *Bryant v. Trucking*, No. 4:11-CV-2254, 2012 WL 162409, at *5 (D.S.C. Jan. 18, 2012) ("Plaintiff also seeks production of the surveillance video identified by Defendant in its Answer to Plaintiff's Interrogatory # 2.").

disclosures which are mandatory "[e]xcept as exempted by Rule 26(a)(1)(B) or as otherwise stipulated or ordered by the court." Fed. R. Civ. P. 26(a)(1)(A). Here, without a court order, Plaintiff decision to withhold the recording violated Rule 26(a)(1)(A)(ii). At this procedural posture, Plaintiff's delayed-disclosure cases make no difference.

*Weisen v. N. Tier Retail LLC* is instructive. No. 19-cv-2884, 2021 WL 2661513 (D. Minn. June 29, 2021). There, the defendant submitted surveillance footage in support of a motion for summary judgment to show that an ADA plaintiff and his wife did not visit a Speedway store, in contradiction to their deposition testimony. *Weisen*, 2021 WL 2661513, at *1–2. The plaintiff moved to exclude the surveillance footage under Rule 37(c)(1), arguing that the defendant had failed to provide the surveillance footage as required by Rule 26(a). *Id.* at *3. When the court resolved the motion, the plaintiff and his wife had already been deposed. *Id.* at *1–2. In its analysis the court did not cite or otherwise discuss delayed-production cases. *Id.* at *3–4. Rather, it analyzed Rule 26(a)'s impeachment exception and then considered whether the late disclosure was harmless. *Id.* The same is true here. The delayed-production cases do not create an exception to a party's Rule 26(a) obligations without court intervention. They merely reflect application of the same "impeachment-only vs. substantive" evidence analysis. Where courts have allowed delayed production they are simply applying this rule before a deposition is taken. This Court was not given the opportunity to consider the issue prior to Dr. Ternus's deposition. A lawyer who chooses to proceed in this fashion, does so at the risk that a court will find—as this Court does here—that the impeachment exception to Rule

26(a)(1)(A)(ii) does not apply.[10] Plaintiff's failure to disclose the recording violated Rule 26(a)(1)(A)(ii).[11]

## C.  Substantially Justified

Because Plaintiff failed to provide information required by Rule 26(a)(1)(A)(ii), sanctions are appropriate unless the Plaintiff's conduct "was substantially justified or is harmless." Fed. R. Civ. P. 37(c)(1). In the context of the Equal Access to Justice Act, the Supreme Court has interpreted the phrase "substantially justified" to mean "justified in substance or in the main—that is, justified to a degree that could satisfy a reasonable person." *Comm'r, I.N.S. v. Jean*, 496 U.S. 154, 158 n.6 (1990) (quoting *Pierce v. Underwood,* 487 U.S. 552, 565–566 (1988)). Some courts in this District have applied that standard to Rule 37's identical language, *see In Re Nat'l Hockey League Players' Concussion Inj. Litig.*, No. 14-md-2551, 2017 WL 3276873, at *2–3 (D. Minn. July 31, 2017); *Reichel Foods, Inc. v. Proseal Am., Inc.*, No. 019-cv-02604, 2021 WL 4199371, at *1 (D. Minn. Sept. 15, 2021), as have other Circuits. *Sun River Energy, Inc. v. Nelson*, 800 F.3d 1219, 1227 (10th Cir. 2015) ("Rule 37(c)(1) requires only the absence of substantial justification—a less stringent standard characterized as 'not justified to a high degree, but . . . justified to a degree that could satisfy a reasonable person.'" (quoting *Pierce*, 487 U.S. at 565)); *Knight ex rel. Kerr v. Miami-Dade Cnty.*, 856 F.3d 795, 812

---

[10] The Court acknowledges that disclosing the existence of a video—though refusing to produce it—necessarily reduces its "shock value" when later used to impeach a witness. But that is the gamble that the lawyer must face—disclose its existence and reduce its shock value, or conceal its existence and risk sanction. Plaintiff chose the latter.

[11] The Court is of course aware that Rule 26(a)(1)(A)(ii) does not require production of the video but only that it be described (i.e. its existence be made known). That is precisely the point. Had Plaintiff disclosed the existence of the video the Court has little doubt that Mayo would have moved to compel its production and the Court would have resolved the issue at that time just as the courts did in the delayed production cases that Plaintiff cites.

(11th Cir. 2017) ("Substantially justified means that reasonable people could differ as to the appropriateness of the contested action."). Absent binding authority from the Eighth Circuit on this issue, the Court finds this approach persuasive. The question, then, is whether Plaintiff's "position was . . . reasonably based in law and fact." *In Re Nat'l Hockey League*, 2017 WL 3276873, at *3.[12] The burden is on Plaintiff to show that her decision not to disclose was substantially justified. *Watkins Inc. v. McCormick & Co., Inc.*, No. 15-cv-2688, 2023 WL 1777474, at *8 (D. Minn. Feb. 6, 2023).

Plaintiff argues that she "delayed production of the Ternus video based on her counsel's good-faith interpretation of numerous cases from this Circuit and across the country." Pl.'s Sanctions Resp. at 41. Mayo counters that "Plaintiff never had a good-faith legal basis to withhold the Recording from discovery," arguing that "Plaintiff's

---

[12] Courts in this District have also engaged in other inquiries to determine whether a party's failure to disclose was substantially justified. When a party has simply disclosed information late, some courts have considered whether the party was reasonably diligent, along the lines of Rule 16's good-cause standard. *Engleson v. Little Falls Area Chamber of Com.*, 210 F.R.D. 667, 670 (D. Minn. 2002) ("[W]e are provided with no cause, let alone good cause, for the late disclosure."); *N. Star Mut. Ins. Co. v. Zurich Ins. Co.*, 269 F. Supp. 2d 1140, 1145–46 (D. Minn. 2003). Such an inquiry is ill-suited for determining whether Plaintiff's intentional conduct—premised on her interpretation of the law—was substantially justified. Mayo points to a four-factor test that some courts in this District have applied to determine whether to exclude undisclosed evidence under Rule 37. Mayo's Sanctions Mem. at 26–29. But as one court in this District has observed, this four-factor test predates the 2000 amendment to Rule 37(c)(1). *Licensing Corp. v. St. Jude Med. S.C., Inc.*, No. 17-cv-5096, 2020 WL 1617879, at *2 & n.2 (D. Minn. Apr. 2, 2020) (concluding that "there is no such four-factor test"). Moreover, some of the factors considered in that test seem better suited to fashioning an appropriate remedy *after* deciding whether Plaintiff's conduct was substantially justified or is harmless. *Cf. Wegener v. Johnson*, 527 F.3d 687, 692 (8th Cir. 2008) ("When fashioning a remedy, the district court should consider, *inter alia,* the reason for noncompliance, the surprise and prejudice to the opposing party, the extent to which allowing the information or testimony would disrupt the order and efficiency of the trial, and the importance of the information or testimony."). The Court declines to engage in a diligence inquiry or apply the four-factor test here.

concealment of the Recording was not an inadvertent error or innocent misapprehension of her discovery obligations—it was a deliberate scheme to conceal the evidence until Plaintiff could attempt to induce Mayo or its witnesses to unknowingly make statements contradicted by the Recording." Mayo Sanctions Mem. at 27. Though the Court accepts Plaintiff's counsel's representation that he acted in good faith, that alone is not a sufficient basis on which to deny Mayo's motion for sanctions. As the Eighth Circuit and its sister circuits have recognized, bad faith is not required to impose sanctions under Rule 37(c)(1). *Vanderberg v. Petco Animal Supplies Stores, Inc.*, 906 F.3d 698, 704 (8th Cir. 2018) (finding no abuse of discretion despite "the record contain[ing] no hint of bad faith"); *Design Strategy, Inc. v. Davis*, 469 F.3d 284, 296 (2d Cir. 2006) ("Since Rule 37(c)(1) does not require a showing of bad faith, we now hold that such a requirement should not be read into the Rule."); *S. States Rack And Fixture, Inc. v. Sherwin-Williams Co.*, 318 F.3d 592, 596 (4th Cir. 2003) ("Rule 37(c)(1) does not require a finding of bad faith or callous disregard of the discovery rules."); *Sun River Energy*, 800 F.3d at 1227 (no showing of bad faith required).

Weighing several considerations, the Court concludes that Plaintiff's failure to disclose the recording as a part of her initial disclosures was not substantially justified.

First, the recording has significant substantive value. The recording documents Noah's care and discussions with a Mayo doctor in the weeks leading up to his unsuccessful heart transplant. *See generally* Ternus Recording. It captures Dr. Ternus giving Noah and his family assurances that Plaintiff alleges were critical to Noah's consent to the transplant. Compl. ¶ 9 ("These assurances were extremely important to Mr. Leopold."); *see also id.* ¶ 30. Relatedly, the recording shows Dr. Ternus discussing

28

aspects of the informed-consent process, another critical issue in this case. During the recorded conversation, Dr. Ternus also made statements regarding risk-factors associated with donor hearts, another important issue. To the extent Plaintiff is arguing that the recording lacks substantive value, the Court finds that position is unreasonable.[13]

Moreover, counsel has used the recording as substantive evidence. Although counsel impeached Dr. Ternus with the video, he also used the recording to establish the existence of several statements important to the merits, and then pressed Dr. Ternus on the truth, importance, and meaning of those statements. *See, e.g.*, Ternus Depo. at 15 (50:21–52:6). In fact, a large portion of the video had little to no impeachment value. *See, e.g.*, Ternus Recording at 5:16–22 (marginal-heart statement) Therefore, to the extent counsel claims he used the recording only to impeach Dr. Ternus, that position is also unreasonable.

In addition, to the extent Plaintiff argues her subjective intent controls, regardless of (1) how a party objectively uses the evidence; (2) the substantive value inherent in the evidence; and (3) the capacity for the evidence's substantive value to be separated from its impeachment value, this legal position is unreasonable. While there is no binding precedent on this issue in the Eighth Circuit the weight of persuasive authority does not support Plaintiff's decision to withhold the recording. Nor has any court expressly adopted

---

[13] Plaintiff argues that the recording is "fundamentally different" from surveillance video, a category of evidence which she concedes "by [its] nature shed light on the subjective elements of a plaintiff's damages claims." Pl.'s Sanctions Resp. at 33. The Court disagrees. To the contrary, as one court observed, "[u]nlike surveillance videos that are often taken of the plaintiff following the filing of the lawsuit at the suggestion of defendant's counsel, in order to document the true nature of plaintiff's alleged injuries for purposes of impeachment at trial, [this recording] actually represent[s] substantive evidence of the facts and circumstances that led up to the filing of the litigation." *Costa v. AFGO Mech. Servs., Inc.*, 237 F.R.D. 21, 25 n.1 (E.D.N.Y. 2006).

her broad view of the impeachment exception and even to the extent a few cases could be read to do so, the Court finds Plaintiff's expansive interpretation of these few cases insufficient to render her legal position substantially justified. *See, e.g.*, *FA ND Chev, LLC v. Kupper*, No. 1:20-CV-138, 2023 WL 5822419, at *4–5 (D.N.D. July 31, 2023) (finding that a party's failure to disclose text messages was not substantially justified, despite the party's argument that it was used to impeach a witness by contradiction in the witness's deposition); *Morris v. Metals USA*, No. 2:09-CV-1267, 2011 WL 94559, at *5–6 (D.S.C. Jan. 11, 2011) (concluding that a party's unilateral designation of surveillance footage as impeachment evidence was not substantially justified); *Toliver v. JBS Plainwell, Inc.*, No. 1:11-CV-302, 2014 WL 359494, at *2–4 (W.D. Mich. Feb. 3, 2014) (finding that a similarly broad interpretation of Rule 26(a)'s impeachment exception was not substantially justified). *But see McDaid v. Stanley Fastening Sys., LP*, No. CIV. 07-709, 2008 WL 2928387 (E.D. Pa. July 28, 2008) ("[B]ecause plaintiff did not act in bad faith in refusing to disclose the video—indeed plaintiff made a cogent argument that he had no obligation to disclose . . . , plaintiff's failure to disclose up to this point will not be held against him.").[14]

In short, when considering the substantive nature of the recording, how counsel used the recording, and the state of the law, the Court concludes that Plaintiff's failure to disclose the recording—as required by Rule 26(a)(1)(A)(ii)—was not substantially justified.

---

[14] Although, as in *McDaid*, the Court finds that Plaintiff acted in good faith and raised a cogent argument, the Court disagrees that this satisfies the substantially justified standard. *See Pierce v. Underwood*, 487 U.S. 552, 556 (1988) ("To be 'substantially justified' means, of course, more than merely undeserving of sanctions for frivolousness."). Rather, the Court will weigh such considerations when exercising its discretion in crafting an appropriate remedy.

D.    **Harmless**

Sanctions are not warranted if the late disclosure "is harmless." Fed. R. Civ. P. 37(c)(1). "Eighth Circuit case law is silent as to the precise nature of . . . a test for determining whether failure to disclose information [is] . . . harmless under Rule 37(c)(1)." *Niazi Licensing Corp. v. St. Jude Med. S.C., Inc.*, No. 17-cv-5096, 2020 WL 1617879, at *2 (D. Minn. Apr. 2, 2020). In general, courts in this District examine whether the late disclosure caused the opposing party some form of prejudice. *Evans ex rel. Evans v. Krook*, 680 F. Supp. 3d 1080, 1108 (D. Minn. 2023) (considering "the potential prejudice that would arise from allowing the material to be used at Trial, or on a Motion"). For example, courts have found that the failure to timely disclose a supplemental expert report caused prejudice by requiring the opposing party to "spend time and money to address the new . . . opinions." *Snyders Heart Valve LLC v. St. Jude Med. S.C. Inc.*, No. 18-cv-2030, 2020 WL 13190009, at *3 (D. Minn. July 1, 2020). Another court in this District found that the untimely disclosure of witnesses for trial "prejudice[d] Defendant because Defendant lack[ed] any specific information allowing it to prepare for the rebuttal witnesses' testimony at trial." *Delgado-O'Neil v. City of Minneapolis*, No. 08-cv-4924, 2010 WL 11645683, at *3 (D. Minn. May 11, 2010); *see also id.* at 3 n.6 ("Plaintiff's late disclosure deprived Defendant of the opportunity to depose these witnesses or propound additional interrogatories regarding their testimony."). As these cases demonstrate, the inquiry is flexible and pragmatic.

Mayo argues that "[b]y concealing the Recording until Dr. Ternus's deposition, Plaintiff was able to procure testimony from Dr. Ternus that was unfairly influenced" by his lack of awareness of the recording's contents. Mayo's Sanctions Mem. at 28–29.

31

Plaintiff counters that the late disclosure is harmless because if "Dr. Ternus had simply told the truth, there would have been no impeachment." Pl.'s Sanctions Resp. at 46. For support, Plaintiff cites *Weisen v. N. Tier Retail LLC*, No. 19-cv-2884, 2021 WL 2661513 (D. Minn. June 29, 2021). But *Weisen* is inapposite. In *Weisen,* defendant submitted surveillance footage in support of summary judgment to show that plaintiff had not in fact visited the relevant Speedway store (which was the basis for plaintiff's ADA claim.) *Weisen*, 2021 WL 2661513, at *1–2. The court found the failure to disclose harmless "because Weisen knew whether he was at the Bloomington Speedway on November 21, 2019, as he repeatedly represented. . . . it is not the video's late disclosure that harmed Weisen but the fact that the video disproves his and his wife's deposition testimony." *Weisen*, 2021 WL 2661513, at *4. The video was substantive evidence that refuted plaintiff's claim and plaintiff did not argue that its use for impeachment was the prejudice he suffered. Rather, he argued that the late disclosure prevented him from deposing the store clerk in the video" in order to challenge the video. *Id.* The court was not convinced, noting that the plaintiff "should have been aware there was a clerk assisting him and could have sought discovery related to the clerk" and that the plaintiff's failure to move for a continuance or schedule modification when Speedway disclosed the video undermined his position that an earlier disclosure would have made a difference. *Id.*

This case is quite different. If counsel had disclosed the recording prior to Dr. Ternus's deposition, there is little question it would have refreshed his recollection as to the statements made and he would have testified to having made those statements. The impeachment is the prejudice that resulted from the failure to disclose the recording. Moreover, the impeachment itself is ambiguous. People often do not recall verbatim

32

statements they made in the past. *See* 8 Charles A. Wright & Arthur R. Miller et al., *Federal Practice & Procedure: Civil* § 2027 (3d ed. June 2024 update) ("It is not a sufficient answer to say that a truthful party will tell his or her attorney the same things he or she told the adversary. Even the most honest persons may well forget particular details with the passage of time."). It is not so clear that Dr. Ternus and Mayo could have simply "told the truth" as Plaintiff insists. *See* 8 Charles A. Wright & Arthur R. Miller et al., *Federal Practice & Procedure: Civil* § 2027 (3d ed. June 2024 update) ("Even the most honest persons may well forget particular details with the passage of time."). Dr. Ternus initially testified he did not recall making the statements alleged. Only when forced did he say that some, not all, of the statements did not sound like something he would have said and that he therefore believed it unlikely he said them. A jury could conclude that Dr. Ternus testified truthfully at his deposition. Thus, it is the late disclosure that led to inconsistencies – or at least apparent inconsistencies – that would not have occurred if Dr. Ternus had been given the opportunity to review the recording and refresh his recollection of a conversation that had occurred almost a year earlier.

Moreover, Mayo argues that the unfair surprise of the recording's existence not only resulted in false impeachment but had a prejudicial impact on all of Dr. Ternus's testimony. Stated in a less "lawyerly" fashion Mayo argues essentially that Plaintiff's deposition surprise rattled Dr. Ternus, throwing him off his game. A discomfited witness does not perform as well—in either the substance of his answers or the way they are delivered. This prejudice too was the direct result of the failure to disclose the video recording. In short, Plaintiff has not demonstrated that the late disclosure was harmless.

**E.      Sanction**

Having concluded that Plaintiff's late disclosure was neither substantially justified nor harmless, the final question is the appropriate remedy. "When a party fails to provide information or identify a witness in compliance with Rule 26(a) or (e), the district court has wide discretion to fashion a remedy or sanction as appropriate for the particular circumstances of the case." *Wegener v. Johnson*, 527 F.3d 687, 692 (8th Cir. 2008). When crafting a remedy, courts should consider the reason for noncompliance, the prejudice to the opposing party, the capacity for a lesser remedy to cure the prejudice, the importance of the testimony (*i.e.*, the impact of the remedy on the sanctioned party's ability to prosecute the case), and bad faith. *Id.*; *Sellers v. Mineta*, 350 F.3d 706, 711–712 (8th Cir. 2003); *Marti v. City of Maplewood*, 57 F.3d 680, 683 (8th Cir. 1995).

To begin, Mayo has not requested that the Court exclude the recording but rather that the Court "completely exclude" Dr. Ternus's deposition and award Mayo monetary sanctions. Mayo's Sanctions Mem. at 30–33. What does exclusion of the deposition mean in practical effect? Rule 32(a), which governs the use of a deposition at trial, permits several uses. First, it permits use of the deposition to impeach a witness or for any other purpose allowed by the rules of evidence. Fed. R. Civ. P. 32(a)(2). Second, it allows a deposition to be introduced as substantive evidence, but only if the deponent is a party, a party's officer, director, managing agent or corporate designee under Rules 30(b)(6) or 31(a)(4). Fed. R. Civ. P. 32(a)(3). Dr. Ternus is not a party, nor is he an officer, director, managing agent or corporate designee of defendant Mayo.[15]

---

[15] The rule also permits Plaintiff to introduce Dr. Ternus's deposition as substantive evidence should he be unavailable to testify at trial. Fed. R. Civ. P. 32(a)(4). Barring unforeseen circumstances the Court assumes Dr. Ternus will testify live at trial. Should

Thus, at present, any sanction on use of Dr. Ternus's deposition would relate to use for impeachment should Dr. Ternus testify at trial in a manner inconsistent with his testimony at his deposition. Mayo's requested sanction as the Court understands it, then, is that the deposition would effectively disappear from the legal landscape. If Plaintiff asks at trial the same question(s) that were asked at Dr. Ternus's deposition Dr. Ternus would be free to answer them without fear of impeachment with his prior testimony. That, at least, is how the Court understands the practical effect of the proposed sanction.

The Court will decline to order that sanction. Presumably Dr. Ternus answered truthfully to the best of his ability the questions that were asked, even if his answers were less eloquent or otherwise influenced by his discomfort from being surprised by the video. If his answers at trial differ from his answers in his deposition he may be impeached with his deposition. But Dr. Ternus, like any witness, will be afforded the opportunity to explain his answers and why they are different at trial. The alternative—keeping from the jury answers given under oath, even in the circumstances presented-would go too far. Assuming Dr. Ternus is available at trial the deposition will not be admitted as substantive evidence. Nor will Plaintiff be permitted to use the deposition to impeach Dr. Ternus as to testimony he gave at deposition regarding whether he made the statements captured on the recording or otherwise regarding the contents of the recording itself.

In summary, as a Rule 37(c)(1) sanction, the Court precludes Plaintiff from using Dr. Ternus's deposition to impeach him regarding the contents of the recording. This means that if Dr. Ternus testifies at trial that he told Noah he had the luxury of time, for

---

unforeseen circumstances occur such that Dr. Ternus is unavailable to testify in live at trial the Court will consider the issue at that time.

example, Plaintiff may not use his deposition to impeach him by contradiction. However, if Dr. Ternus testifies inconsistent with the recording, nothing in this Order prevents Plaintiff from impeaching him with the recording at trial.[16] This narrow sanction reflects (1) the Court's finding that counsel did not act in bad faith; (2) the limited importance of the evidence excluded (a portion of Dr. Ternus's deposition); (3) the inability of an alternative remedy to cure this prejudice; and (4) Plaintiff's nonfrivolous arguments to justify her conduct, even though the Court ultimately concluded that her positions were not substantially justified. Moreover, this sanction will narrowly excise the primary prejudice—the impeachment and contradictory testimony—which resulted from Plaintiff withholding the recording.

Finally, for the reasons discussed at length above, will the Court deny Mayo monetary sanctions.

## ORDER

For the reasons set forth above, **IT IS HEREBY ORDERED**:

1.    Defendant's Motion for Sanctions (Dkt. No. 37) is **GRANTED IN PART** and **DENIED IN PART**.

2.    Plaintiff is prohibited from relying upon Dr. Ternus's deposition to impeach him regarding the contents of the recording.

Dated: March 10, 2025                          ___s/ David T. Schultz_____
                                               DAVID T. SCHULTZ
                                               U.S. Magistrate Judge

---

[16] Subject to evidentiary objections raised in the ordinary course.